**AIR LINE STEWARDS AND STEWARDESSES ASSOCIATION, LOCAL 550, TWU, AFL–CIO, et al., Plaintiffs-Appellees,**

v.

**AMERICAN AIRLINES, INC., Defendant-Appellant.**

No. 84–1073.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 5, 1984.

Decided June 7, 1985.

Rehearing and Rehearing En Banc Denied Aug. 15, 1985.

Jeffrey B. Lieberman, Schuyler, Roche & Zwirner, Chicago, Ill., for plaintiffs-appellees.

Gordon B. Nash, Jr., Gardner, Carton & Douglas, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and WOOD and ESCHBACH, Circuit Judges.

ESCHBACH, Circuit Judge.

American Airlines appeals an order of the district court directing it to give retroactive retirement credit to all flight attendants who have returned to work in accordance with the provisions of a 1977 settlement agreement, and who desire to participate in its retirement plan. The district court held that the settlement agreement requires American Airlines to give such retroactive retirement credit. We must decide whether the district court's interpretation of the settlement agreement is correct. We reverse.

I

Until October 1970 it was the practice of defendant/appellant American Airlines, Inc. ("American") to terminate flight attendants who became pregnant. In 1972 plaintiff/appellee Darlene Burmeister (then Preston), one of the flight attendants terminated, commenced a class action against American, charging that the practice violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[1] In 1976 the district

---

1. We omit parts of the history of the case not essential to the understanding of this appeal.

court entered summary judgment against American on the issue of liability. On August 3, 1977, while American's appeal was pending, the parties entered into a written settlement agreement (the "Settlement Agreement"), which provided in essence that (1) a pro rata share of the remainder of $2,700,000, after court awards for litigation expenses, costs, and attorneys' fees were deducted, would be paid to each class member; (2) American would re-employ all class members who applied and met various requirements; and (3) all returning class members would receive the amount of company and occupational seniority and credit for length of service that they would have received if American had not terminated their employment. The district court approved the settlement in October 1977 and dismissed the class action.

On January 3, 1983, Burmeister filed a motion in the district court seeking specific performance of the Settlement Agreement. In particular, she asked the district court to direct American to provide retroactive retirement credits to class members re-employed under the Settlement Agreement. In the alternative, she asked the court to vacate its order approving the Settlement Agreement, so that the litigation might continue. On May 20, 1983, the district court granted the motion for specific performance, holding that according to the clear and unambiguous terms of the agreement, "plaintiff and the returning class members are entitled to receive any and all of the benefits they would have received had they not been discharged by American." On May 31, 1983, American moved under Rule 59(e) of the Federal Rules of Civil Procedure for reconsideration of the May 20 order. The district court denied the motion.

American appeals from the May 20 order of specific performance and the subsequent denial of its Rule 59(e) motion. Our disposition of the appeal from the May 20 order

For further details see *Airline Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960 (7th Cir.) (per curiam), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58

renders the second matter moot, and we do not reach the issues raised in it.

## II

■ The issue presented to us is whether the Settlement Agreement requires American to give retroactive retirement credit to class members who returned to work in accordance with its terms. The parties agree that the answer hinges on the meaning of the following provision in section V of the Settlement Agreement, entitled "Seniority and Credit for Length of Service":

A. Each re-employed class member shall be credited with the amount of company seniority and length of service to which she was entitled at the date on which her employment was terminated plus company seniority and such length of service for the entire compensation period [the period between termination and approval of the Settlement Agreement], except for those periods of time during which she was disabled from working by reason of pregnancy or otherwise.

Thus we are presented with a question of contract interpretation. The interpretation of settlement agreements is governed by principles of state law applicable to contracts generally. *See Air Line Stewards and Stewardesses Assoc., Local 550 v. Trans World Airlines, Inc.,* 713 F.2d 319, 321 (7th Cir.1983) (quoting *Florida Education Association, Inc. v. Atkinson,* 481 F.2d 662, 663 (5th Cir.1973)). The Settlement Agreement contains no choice of law clause; we thus follow the district court in looking to Illinois law for applicable principles of contract construction.

### A. The Ambiguity of the Settlement Agreement

■ The primary object in construing a contract is to give effect to the intention of the parties. *Schek v. Chicago Transit Authority,* 42 Ill.2d 362, 364, 247 N.E.2d

L.Ed.2d 190 (1978). Though named in the caption, Air Line Stewards and Stewardesses Association, Local 550, is not a party in this appeal.

886, 888 (1969). The starting point is the Settlement Agreement itself; if the language of the Settlement Agreement clearly and unambiguously determines an answer to the question at issue, then the inquiry is over. *See J.R. Watkins Co. v. Salyers*, 384 Ill. 369, 373, 51 N.E.2d 574, 576 (1943). Whether a contract is ambiguous is a conclusion of law, reviewed de novo. *National Tea Co. v. American National Bank & Trust Co.*, 100 Ill.App.3d 1046, 1049, 56 Ill.Dec. 474, 476, 427 N.E.2d 806, 808 (1981). If the trial court holds that the contract is unambiguous, it must then go on to declare the meaning, and its declaration is likewise a conclusion of law, reviewed de novo. *See Hagerty, Lockenvitz, Ginzkey & Associates v. Ginzkey*, 85 Ill. App.3d 640, 641, 40 Ill.Dec. 778, 779, 406 N.E.2d 1145, 1146 (1980). But if the trial court holds that the contract is ambiguous, the meaning becomes a question of fact to be submitted to the trier of fact. *Id.* at 642, 40 Ill.Dec. at 779, 406 N.E.2d at 1146. The trier of fact considers not only the language of the contract but also any extrinsic or parol evidence presented by the parties. *See Fox v. Inter-State Assurance Co.*, 84 Ill.App.3d 512, 515, 39 Ill.Dec. 894, 897, 405 N.E.2d 873, 876 (1980). Its determination is a finding of fact and is reviewed as such.

In this case the district court held that the Settlement Agreement unambiguously provides retroactive retirement credit to returning class members; under the principles just outlined, our review of this conclusion is de novo. Reading section V A in the context of the entire agreement, as we must, *Martindell v. Lake Shore National Bank*, 15 Ill.2d 272, 283, 154 N.E.2d 683,

689 (1958), we find that we are unable to determine solely from the language of the Settlement Agreement whether section V A is intended to grant such credits. It does not expressly mention retroactive retirement credit at all. Credit for company seniority and length of service may include retroactive retirement credit by implication, but we cannot ascertain this from section V A or any other provision of the Settlement Agreement.[2] Indeed, while it is clear that the parties intended the express grant of company seniority and credit for length of service to have beneficial consequences for the re-employed class members, we cannot determine from the face of the agreement what any of those beneficial consequences might be. The terms "company seniority" and "length of service" are not defined in the Settlement Agreement, either expressly or by reference to another document. No documents are incorporated by reference into the Settlement Agreement. No clause in the Settlement Agreement identifies or defines the specific benefits that are to flow from the grant of company seniority and credit for length of service. The language of section V A is compatible with an intention to grant retroactive retirement credit and also compatible with an intention not to grant it. Neither intention is so clearly favored by the language that we can say as a matter of law that one and not the other is embodied in the Settlement Agreement.[3]

▮▮▮ We therefore hold that the district court erred in concluding as a matter of law that the Settlement Agreement unambiguously awards retroactive retirement credit to returning class members. The

---

**2.** Section III of the Settlement Agreement outlines the structure of the entire settlement; later sections fill in details. Section III C says: "All re-employed class members shall have, be credited with and enjoy the amount of Seniority and Credit for Length of Service as provided in Section V hereof." This provision, which refers to section V for details, sheds no additional light on the meaning of section V with respect to the question at issue.

**3.** Burmeister argues earnestly that we can determine from the clear and unambiguous language

of the Settlement Agreement itself, without reference to any extrinsic evidence, that credit for length of service means Credited Service, a defined term of American's Retirement Benefit Plan. *See infra* pt. II B (iii). But without consulting the Retirement Benefit Plan we have no way of knowing that the term "Credited Service" occurs in it, or what the term means, or whether a grant of retroactive Credited Service would amount to a grant of retroactive retirement credit. Burmeister's own argument thus requires us to consider some extrinsic evidence.

Settlement Agreement is ambiguous, and its meaning is a question of fact. Consequently extrinsic evidence may, and indeed must, be considered in determining its meaning.[4]

If we were to follow the general rule, we would end our opinion at this point and remand the case for findings of fact. There are, however, strong reasons for not following the general rule in this case. The parties have thoroughly briefed the issue before us and have submitted to us all the extrinsic evidence that they have. The evidence is entirely documentary; no determinations of the credibility of witnesses are required. We are in as good a position to evaluate this evidence as the district court. Our own survey of the evidence persuades us that it compels one conclusion and that a contrary conclusion would be clearly erroneous. To remand the case would require yet a third round of argument in the district court, doubtless to be followed by a fourth round on appeal. When we know the inevitable outcome, it would be a waste of judicial resources and an undue burden on the parties for us to order a remand. Accordingly, we shall depart from the general rule and forgo a remand.[5]

### B. The Extrinsic Documentary Evidence

Because the Settlement Agreement does not define "company seniority" and

"length of service," it is highly likely that the parties intended for these terms to have the significance that they have in some other document or documents governing the relationships among American, the flight attendants, and their union, and that the parties viewed the reference of the two terms to these other documents as too obvious to require explicit mention.[6] Since we must interpret the Settlement Agreement in accordance with the intentions of the parties, and since we have determined that the Settlement Agreement is ambiguous, permitting us to consider extrinsic evidence, we shall adopt the following procedure: we shall examine the three principal documents that govern the relationships among American, the flight attendants, and their union—American's regulations, the collective bargaining agreement, and the retirement plan—as they were in effect on the date of the Settlement Agreement, in order to determine if the terms "company seniority" and "length of service" can be traced to any of them, so as to permit plausible inferences as to the beneficial consequences for flight attendants that the parties intended to flow from section V A.[7] In the light of our results we shall then consider the merit of the proposition that section V A grants retroactive retirement credit to reemployed class members.

#### (i) American's Regulations

In section 120–8 of the Regulations of

4. The Settlement Agreement contains an exclusivity clause as section XII, which reads as follows:

Nothing contained in any other agreement or writing and no right or obligation which has arisen or accrued outside of this Settlement Agreement (including prior, current and future labor agreements) shall be deemed to modify, change or diminish the rights and obligations which arise under this agreement.

To use extrinsic evidence to determine what rights and obligations arise under the Settlement Agreement is not to use it "to modify, change or diminish" those rights and obligations. Thus the exclusivity clause does not bar the use of extrinsic evidence for the purpose of inferring what the parties have agreed to.

5. In *Anderson v. City of Bessemer City*, — U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Supreme Court cautions courts of appeals

against reviewing a lower court's findings of fact de novo, even when those findings are based on documentary evidence. This admonition does not apply to the present case, because the district court made no findings of fact.

6. Needless to say, we deprecate this approach to the drafting of contracts. If the parties had troubled to state what is meant by "company seniority" and "length of service" or to incorporate definitions by reference to other documents, this case probably would not have arisen.

7. The record contains a complete copy only of the Retirement Plan; our examination of the Regulations and collective bargaining agreement is confined to the parts in the record. In principle, we could consider other forms of extrinsic evidence as well, but we have found nothing useful in the record.

American Airlines [8] we find three types of seniority defined: Company, Occupational, and Classification.[9] Company Seniority is "accredited service with the Company in any job classification." The "Company Seniority Date" is the date of employment by American or by a subsidiary or predecessor company, subject to adjustment for periods of inactive status. The Company Seniority Date determines the length of "accredited service" with American and is the basis for determining an employee's eligibility for length of vacation, vacation termination pay, leaves of absence, initial sick leave, jury duty pay, travel, length of service awards, retirement benefits,[10] and long-term disability insurance. "Accredited service," we take it, is the period of time from the Company Seniority Date (adjusted for discontinuities of service) to the date of termination or to the present. "Company Seniority" appears to be nothing more than accredited service. The term "length of service" does not appear in the regulation, and we see no basis for inferring that "length of service" (as used in the Settlement Agreement) means accredited service.

### (ii) The Collective Bargaining Agreement

The collective bargaining agreement between American and its flight attendants in effect in 1977 (the "CBA") defines "Service" as "the period of time assigned to active duty as a flight attendant with the Company unless otherwise specified." CBA art. 2(d). In Article 3, on compensation, we read: "For each full month of service, a flight attendant shall receive a base pay amount in accordance with his or her length of service as a flight attendant as follows: [table omitted]." The term "length of service" is not defined, but perhaps it need not be. If "service" is used as defined, then "length of service" would appear to mean, ex vi termini, the sum of all periods of service. Length of service also figures in the determination of incentive pay, apparently for overtime work, for which a separate table is provided.

In Article 9, entitled "Seniority General," we read: "Seniority as a flight attendant shall be based on the length of service as a flight attendant...." Under the Regulations, see supra note 9 and accompanying text, this means Occupational Seniority, not Company Seniority.

Article 14, entitled "Transfer to Non-Flying or Supervisory Duties," provides that a flight attendant transferred to supervisory or other non-flying duties "shall retain and continue to accrue seniority and length of service credit for pay purposes for a period of one (1) year...."

The generalization that we draw from these provisions is that length of service as a flight attendant determines a flight attendant's pay and Occupational Seniority.

### (iii) The Retirement Plan

American's Retirement Benefit Plan for Flight Attendants, amended and restated as of January 1, 1976, (the "Retirement Plan"), was in effect in 1977. Under the plan, membership is voluntary; to be eligible, a flight attendant must be twenty-five years old and have completed a year of service. Members are required to make regular contributions to the plan,[11] and

---

**8.** The copy of this regulation contained in the record bears a date of 1982, and we are not certain that the same regulation has been in effect without amendment since 1977. Neither party has objected to the inclusion of a 1982 regulation in the record, although certain difficulties do arise. See infra p. 885.

**9.** "Occupational Seniority" is accredited service in any particular "family" or "title group" under a labor agreement and applies only to employees covered by labor agreements. The term "seniority" as used in labor agreements with American, means "Occupational Seniority," un-

less the agreement specifies otherwise. "Classification Seniority" is accredited service in a particular job classification under a labor agreement or in Agent or Clerical/Other job classification under the Non-Management Salaried Pay Plan.

**10.** On the inclusion of retirement benefits in this list, see infra p. 885.

**11.** In 1981 American agreed to an amendment of its collective bargaining agreement that changed the Retirement Plan to eliminate past and future contributions by the flight attend-

American is required to contribute the amounts necessary to fund the plan's obligations on a sound basis.

Roughly speaking, members are credited with one year of "Vesting Service" for each year they are credited with at least 386 Hours of Service, *see infra* note 12, after reaching age twenty-two. Members terminated with ten or more years of Vesting Service are entitled to a benefit on retirement; those with less than ten years of Vesting Service on termination of employment receive their own contributions back with interest.

Again speaking roughly, members are credited with one year of "Credited Service" for each year in which they are credited with at least 734 Hours of Service, *see infra* note 12, while both an employee and a member of the plan. Credited Service is a crucial factor in the determination of the amount of the retirement benefit to which a member is entitled.

Although fifty terms are expressly defined in the definitions article of the plan, neither "company seniority" nor "length of service" is among them. We have not been cited to, nor have we ourselves been able to find, any occurrences of these terms in the entire plan. We do find the expression "aggregate years of service." The definition is somewhat intricate and is set out in the margin.[12] The only significance of the

aggregate years of service that we can find lies in the determination of the date of eligibility for readmission to the plan following a break in service.[13] Art. III, § 3.6.

## C. "Length of Service" in Section V A

Our examination of the Settlement Agreement, American's Regulations, the CBA, and the Retirement Plan suggests some possible conclusions: (1) that the term "company seniority" as it appears in section V A of the Settlement Agreement means Company Seniority as defined in the Regulations, (2) that the term "length of service" as used in section V A means length of service as used in the CBA, and (3) that section V A's credit for length of service does not implicate the Retirement Plan or provide retroactive retirement credit. But this is too hasty; a full reading of section V persuades us that (2), at least, is erroneous.

Section V comprises two subsections, A and B, more or less parallel. Subsection B grants to re-employed class members "full occupational (union) seniority and credit for length of service to the same extent as provided in Section V A ...," provided the union concurs in writing. If the union does not concur in writing, then "the amount of seniority and credit for length of service will be determined by the Court...."[14]

---

ants. The amendment provided that previous employee contributions would be refunded to employees at work on September 1, 1981.

**12.** An "Hour of Service" is any hour for which the employee is paid, whether for work performed or for vacation, holiday, etc. Art. II(z) (paraphrased). A "year of service" is any calendar year during which the employee is credited with 386 Hours of Service. The "aggregate years of service" are the number of years of service. Art. III, § 3.2 (paraphrased).

**13.** If the break in service equals or exceeds the individual's aggregate years of service, then the prior service is disregarded and the individual is treated as a new employee. Otherwise, the individual becomes a member on the date on which he or she is first credited with an Hour of Service, *see supra* note 12, after termination, unless the date on which he or she would become a member without regard for this provision is later. Art. III, § 3.2 (paraphrased).

**14.** At the time the Settlement Agreement was approved, the Association of Professional Flight Attendants (APFA) had replaced the Air Line Stewards and Stewardesses Association as the exclusive bargaining representative for American's flight attendants. Section V B refers to APFA. Far from concurring in writing, APFA intervened in the proceeding below while the court was considering the Settlement Agreement, for the purpose of objecting to the Settlement Agreement's grant of retroactive occupational seniority to re-employed class members. APFA argued that such a measure would be an onerous burden on incumbent employees. The district court nevertheless approved the Settlement Agreement and in its order of October 4, 1977, expressly ordered that re-employed class members be restored to full occupational (union) seniority and credit for length of service as provided. The union appealed the order, and we affirmed. *Airline Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960 (7th Cir.) (per curiam), *cert.*

Occupational seniority is the second kind of seniority defined in the Regulations. *See supra* note 9. It determines priority of bidding for days off and flights and priority of layoffs and recalls. Section V is divided into two subsections apparently in order to provide the union with a veto over restoration of full occupational seniority and the corresponding length of service.[15] Occupational seniority is treated in the CBA and is apparently a subject of collective bargaining, whereas company seniority is apparently not. The length of service on which pay depends under the CBA is clearly length of service *as a flight attendant,* i.e., length of service in that occupation, rather than length of service with the company. CBA art. 2(d), 3(a). Since "length of service" in section V B occurs in tandem with "occupational (union) seniority," we think it likely that it means length of service in the occupation of flight attendant. In that case, a re-employed class member's pay will be determined by the length of service accorded to her under section V B, and not section V A. If "length of service" in section V B means length of service as a flight attendant, then "length of service" in section V A doubtless means length of service with the company. We think it is clear that they cannot mean the same thing, because the union is given a veto power over the Settlement Agreement's award of the one but not of the other. The length of service referred to in section V A appears to be beyond the reach of collective bargaining, just as company seniority is. But we are puzzled as to its significance.

One possibility, suggested by American, is that "length of service" in section V A means "accredited service" as defined in the Regulations. But this is highly implausible, because company seniority is nothing but accredited service with the company. On that reading, the phrase "company seniority and length of service" would be a pleonasm, like "triangle with three sides."

Certainly the parties intended credit for "length of service" under section V A to be something in addition to credit for company seniority, and they intended for that credit to have beneficial consequences of some sort for the reemployed class members. But we have been unable to discover any independent significance for length of service with the company, as opposed to length of service as a flight attendant or company seniority. It appears to be an idle wheel.

## D. Burmeister's Position

Burmeister contends that the credit for "length of service" in section V A is (or includes) a grant of retroactive retirement credit. In the absence of any straightforward explanation of the significance of the credit for length of service in section V A, this contention has some facial plausibility. At the least, it gives a function to an otherwise functionless term. Bringing retirement credits within the scope of section V A is not wholly arbitrary either; according to the Regulations, company seniority determines an employee's eligibility for retirement benefits.[16] Since the Retirement Plan is outside the scope of the CBA, if the Settlement Agreement was intended to give retroactive retirement credit, the grant would most likely have occurred in section V A.

In support of her position Burmeister argues that the close similarity between the terms "Credited Service" in the Retirement Plan and "credit for length of service" in section V A shows that section V A is intended to give re-employed class members retroactive Credited Service. She maintains further that this is the clear and unambiguous intent of section V A, when its terms are accorded their ordinary and natural meaning. She points out that the Notice to Class Members, on which the parties agreed, stated that each re-employed class member will be restored to full

---

*denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

**15.** This veto could be, and was, overriden by the court. *See supra* note 14.

**16.** On this point, the Regulations do not appear to agree with the Retirement Plan. *See infra* p. 885.

seniority and credit for length of service, which will apply *for all purposes*, and that American has in fact used the retroactive credit for seniority and length of service for the purpose of computing all employee benefits tied to seniority and length of service—with the sole exception of benefits under the Retirement Plan. Finally, she argues that she, as the named plaintiff, understood when she signed the Settlement Agreement that it included retroactive retirement benefits, and that she would not have signed it if she had believed that no such benefits had been included.

### E. Analysis

After considering all the arguments of the parties, we think that Burmeister's case is weak and that the reasons for not finding in section V A a grant of retroactive retirement credit are overpowering. Burmeister exaggerates the similarity of "Credited Service" and "credit for length of service." "Credited Service" is a defined term of the Retirement Plan that conspicuously does not appear in section V A. If "length of service" is given its ordinary and natural meaning, it certainly would not mean "Credited Service" under the Retirement Plan but simply the length of time the employee has been with the company.

Furthermore, if the parties had intended to allow for retroactive retirement credit, it is unlikely that they would have done so by a simple blanket extension of Credited Service to all re-employed class members for the entire compensation period. Participation in the Retirement Plan was voluntary, and according to the only evidence on

the point that we find in the record, only one or two of the 120 re-employed class members had joined the Retirement Plan before termination.[17] Participation required more than an election to participate; members had to make regular contributions. In view of this it could hardly have been known to the negotiators of the Settlement Agreement that all the re-employed class members would want to participate or would have been able to make the required retroactive contributions.

If the parties had intended to accord retroactive retirement credits to re-employed class members, we think it highly likely that they would have mentioned the Retirement Plan or at least used distinctive terms like "retirement credit" or "Credited Service," and that they would have provided all re-employed class members the option of joining the plan or not, provided for the effective date of joining, and provided for the payment of back contributions so as to bring each member's account up to date. In view of the complexity and precision of the Retirement Plan, the value of rights under it, and the potential for continued confusion and controversy over details, we think it most unlikely that the parties, in providing for retroactive retirement credit, would have contended themselves with an oblique and uncertain reference to credit for "length of service," letting all the rest go. The language of section V A more readily supports the conclusion that the parties did not intend to include retroactive retirement credit in the Settlement Agreement.

The language in the Notice to Class Members [18] cannot be given controlling

---

**17.** The affidavit of Eva Chang, American's Manager of Pension Plan Administration, states on information and belief that "only one or two of the 120 returning class members had joined the Retirement Benefit Plan at the time of their initial employment with American Airlines." We interpret "at the time of their initial employment" to mean "before they were terminated for pregnancy." It cannot reasonably be taken to mean "at the time they were first hired," because participation in the Retirement Plan requires a year of service. While Burmeister draws our attention to the fact that Chang's statement was made on information and belief,

she submitted no evidence to contradict or correct it.

**18.** The relevant part of the Notice to Class Members reads:

Each re-employed Class Member will be restored to full seniority and credit for length of service, including such seniority and credit for the time since her employment was terminated, but without credit for time during which she was pregnant or otherwise disabled to work. The seniority thus computed will apply for all purposes, including choice of home base and pay.

weight over the Settlement Agreement itself, and in any event it lends no support to Burmeister's position. The notice actually says only that "the seniority thus computed will apply for all purposes," for some reason leaving out length of service, but even if it is interpreted to mean that the length of service thus computed will also apply for all purposes, this can only mean for all purposes for which length of service is used. But bare length of service is not used to compute any variable of significance in the Retirement Plan.[19]

The fact that American has used the re-employed class members' retroactive credit for seniority and length of service for the purpose of computing all employee benefits tied to seniority and length of service except for retirement benefits gives no support to Burmeister's position. The accrual of retirement benefits is not tied to seniority or to mere length of service, but to Vesting Service and Credited Service after one has joined the plan. Furthermore, we think it significant that the benefits that have been provided to re-employed class members in consequence of their retroactive seniority are all current benefits. For example, re-employed class members have not received credit for the paid vacation they would have earned if they had not been terminated; they have received only credit for the paid vacation they have earned after re-employment, based on their retroactively adjusted seniority. If the Settlement Agreement granted retroactive retirement credit to re-employed class members, American would be obligated to fund the retirement benefits actuarially attributable to those credits—an expenditure that American estimates at $850,000, or $86,500 a year for thirty years, almost a third of American's express monetary obligation under the Settlement Agreement.[20] Such an expenditure would be a retroactive benefit—American would have to pay what it would have paid if the re-employed class members had not been terminated and had all been members of the Retirement Plan. We think it unlikely that a uniquely retroactive benefit of such magnitude would have been buried so unobtrusively in the chosen language of section V A amidst other implied benefits that were wholly current, if the parties had really intended to create it.

In addition, we think that section III D of the Settlement Agreement was intended in part to prevent just such massive monetary obligations from being teased out of the language of the Settlement Agreement after it was signed and approved. In section III A, American agreed to pay $2,700,000 to the class, the only monetary obligation to the class members expressly set forth. Section III D reads as follows:

> American Airlines will have no monetary or other obligation to any member of the class or to any representative or attorney for the class unless expressly provided in this Agreement.

No obligation to fund retroactive retirement benefits is expressly provided in the

---

**19.** Since eligibility for membership in the Retirement Plan requires completion of a "year of service," it might be argued that the credit for "length of service" in section V A applies at least to this eligibility requirement. But that is by no means clear. The "year of service" required for eligibility is defined within the Retirement Plan in terms of "Hours of Service," also a defined term. *See supra* note 12. Hours of Service do not accumulate as "length of service" under the plan, but as "aggregate years of service." *See id.* If section V A had spoken of credit for "aggregate years of service," instead of "length of service," the implicit reference to the Retirement Plan would be reasonably clear. But "length of service" is a term foreign to the Retirement Plan, and we cannot say, without begging the question, that the parties intended that the re-employed class members should receive credit for "aggregate years of service" equal to the entire compensation period, a result that would apparently be compelled by the suggested reading of "length of service." Intuitively, a person might serve a year with the company, and thus have one year's "length of service," without fulfilling the number of Hours of Service requisite for a "year of service" under the Retirement Plan.

**20.** This is what it would have cost American in 1981, taking into account the 1981 amendment to the Retirement Plan. *See supra* note 11. The record does not show what it would have cost American in 1977, but the figure would clearly have been substantial, although less.

Settlement Agreement, and section III D bars implied monetary obligations. Indeed, section III D provides a strong reason in itself to think that the parties did not intend to include retroactive retirement credit in the settlement. The parties knew the content of section III D and so would have realized that if the Settlement Agreement was to grant retroactive retirement credits, American's obligation to fund those credits would have to be set forth expressly in the agreement.

In an affidavit attached to her memorandum in support of her motion for specific performance below, Burmeister said the following:

6. In 1977, one of the counsel for plaintiffs informed me that a tentative settlement agreement ("the 1977 Agreement") had been reached with American. I had previously explained that retroactive credited service under the Retirement Plan must be included in the 1977 Agreement in order for it to be acceptable to me. I signed the 1977 Agreement having been assured and led to believe that it included these benefits.

In the same affidavit she also says:

10. Had I believed at the time I signed the 1977 Agreement that it did not provide for retroactive credited service under the Retirement Plan, I would not have signed it on behalf of myself or as a class representative.

If Burmeister had made her understanding clear to *American* before signing the Settlement Agreement, and if *American* assured her and led her to believe that it included retroactive Credited Service, then American might very well be bound by her understanding. But Burmeister conspicuously does not say that she explained to *American* how she understood section V A, or that *American* assured her and led her to believe that her understanding was correct. If she could have truthfully made such assertions, we presume that she would have. Any particular interpretation that only one of the parties may have envisioned at the time the contract was executed is immaterial. *Smith v.*

*Vernon,* 6 Ill.App.3d 434, 436, 286 N.E.2d 99, 101 (1972).

Finally, we consider the effect of section 120–8 of American's Regulations, dated November 24, 1982, which states:

The Company Seniority Date determines the length of "accredited service" with the Company. It is the basis for determining an employee's eligibility for:

. . . .

Retirement Benefits (REG 160–1).

Since this section bears a date of 1982, the quoted passage may have been revised to reflect the 1981 changes to the Retirement Plan. *See supra* note 11. Thus we hesitate to treat it as straightforwardly applicable in 1977. It is insignificant that the passage speaks of "Company Seniority Date" rather than "Company Seniority"; length of accredited service *is* Company Seniority, and, as the passage says, length of accredited service is determined by Company Seniority Date. "Company Seniority" and "Company Seniority Date," though differently defined, appear to us to be functionally interchangeable. The passage refers us to another regulation, REG 160–1, which evidently contains more information. But the parties have not supplied us with REG 160–1, and we do not know what it says. The statement that Company Seniority Date is the basis for determining an employee's eligibility for retirement benefits conflicts with the clear provisions of the Retirement Plan as in effect in 1977, and we doubt that it is true. Article VI of the Retirement Plan, entitled "Eligibility for Benefits," does not make use of the terms "Company Seniority Date" or "Company Seniority," nor does it in any other way indicate that Company Seniority, as defined in the Regulations, plays any part in the determination of an employee's eligibility for benefits. Because of this discrepancy and the uncertain effectiveness of the quoted passage in 1977, we do not find the passage to be trustworthy evidence supporting Burmeister's position.

All of these considerations lead us to conclude, and we hold, that the Settlement Agreement does not provide retroactive re-

tirement credit to re-employed class members.

## III

 In her motion to the district court seeking specific performance of the Settlement Agreement, Burmeister moved in the alternative to vacate the order of October 4, 1977, approving the Settlement Agreement and dismissing the action, "to allow plaintiff to adjudicate fully her cause of action against defendant." Because the district court granted the motion for specific performance, it did not rule on the alternative motion. Thus it may appear that we must remand the case for such a ruling. After reviewing her motion and supporting memorandum, we have come to the conclusion that such a remand is unnecessary.

Burmeister's reason for seeking the vacation of the order is that the Notice to Class Members, *supra* note 18, misled them into believing that they would receive full retroactive credited service under the Retirement Plan. We assume without holding that inadequate notice of a proposed settlement in a class action may be sufficient grounds for vacating the order approving the settlement. *See Simer v. Rios,* 661 F.2d 655, 664 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). But Burmeister submitted no evidence that the notice misled any class member into believing that the Settlement Agreement provided retroactive retirement credit to those re-employed, and no evidence that any class member (besides herself) would have objected to the settlement if the notice had stated explicitly that

retroactive retirement credit was not included.[21]

The language in the notice that Burmeister finds especially misleading is the statement: "The seniority thus computed will apply for all purposes...." As we noted *supra,* the subject of this statement is *seniority,* which, at least in 1977, had nothing to do with the Retirement Plan. It is not seniority but *credit for length of service* that Burmeister consistently portrays as suggesting retroactive retirement credit, yet the statement says nothing about credit for length of service, even though the preceding sentence does.[22]

Furthermore, it appears that the vast majority of re-employed class members were not members of the Retirement Plan when they were terminated.[23] In order to believe on the basis of the notice that they were to receive retroactive retirement credits, such persons would have to infer that the Settlement Agreement retroactively inducted them into the Retirement Plan. It is clear to us that such an inference could not reasonably be based on the language of the notice, without further inquiry.

For these reasons, we hold that the notice to class members was not so misleading as to require the vacation of the order approving the settlement and dismissing the action.[24]

## IV

The judgment of the district court is reversed, and the case is remanded with directions to deny the plaintiff's motion for specific performance of the Settlement Agreement and her motion to vacate the

---

**21.** Burmeister's affidavit of March 18, 1983, states that after she was told in 1979 that she would not receive retroactive retirement credit, she contacted a re-employed class member, Peggy Allen, who engaged counsel to pursue the matter administratively. But the record contains no affidavit from Allen asserting that she was misled by the notice.

**22.** We noted this anomaly *supra,* p. 16. A prudent class member might have inquired whether the omission of "credit for length of service" was deliberate, and if so, what it meant, but as far as we know, no one did.

**23.** *See supra* note 17.

**24.** Ordinarily we would not decide a motion addressed to but not acted on by the district court. In this case, however, we have before us all the briefs and evidence presented to the district court, and since we are in as good a position as the district court to decide the motion, we depart from our usual practice in the interest of judicial economy and put the question of retroactive retirement credits under the Settlement Agreement finally to rest.

order approving the Settlement Agreement.

SO ORDERED.