LaSALLE NATIONAL BANK, et al.,
Plaintiff-Appellant,

v.

SERVICE MERCHANDISE CO.,
Defendant-Appellee.

No. 86–1454.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1986.

Decided Aug. 12, 1987.

Rehearing and Rehearing En Banc
Denied Sept. 30, 1987.

Robert Marks, Marks, Marks & Kaplan, Ltd., Chicago, Ill., for plaintiff-appellant.

Stephen H. Pugh, Jr., Chapman & Cutler, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Appellant, LaSalle National Bank (LaSalle), brought this declaratory judgment action to construe the provisions of leases that govern the rights of tenants in a shopping center owned by LaSalle. Appellee, Service Merchandise Company, Inc., (Service Merchandise), the defendant in the original action, is a tenant in the shopping center. It also brought a counterclaim against LaSalle for the return of alleged rent overpayments. The district court entered judgment for Service Merchandise on the claim and on the counterclaim. For the reasons set forth in the following opinion, we reverse.

## FACTS

LaSalle owns a shopping center in Oak Lawn, Illinois (Shopping Center). It leases space to various commercial enterprises. The tenants share in the real estate taxes and common area maintenance (CAM) expenses. Each tenant's share is determined by multiplying the total expense for the shopping center by a fraction, the numerator of which is the total number of square feet in the tenant's leased premises, and the denominator of which is the total number of square feet of leasable space in the shopping center.

Two sections of the lease govern the application of this formula. Section 2.3 [1] sets up the basic allocation formula described in the foregoing paragraph. Section 2.4 [2] reserves, *inter alia*, the right of

1. Section 2.3 provides:

Taxes. Tenant shall pay promptly when due all taxes imposed upon Tenant's rent, if one should be imposed, and business operation and upon all personal property of Tenant, and shall also pay to Landlord, as additional rent, Tenant's share of real estate taxes as specified in this Section 2.3. Tenant's share of real estate taxes shall be computed by multiplying the total amount of such taxes by a fraction, the numerator of which shall be the number of square feet in the Leased Premises, and the denominator of which shall be the total number of square feet of space leasable in the Shopping Center.

The term 'real estate taxes' shall mean all taxes and assessments (special or otherwise) levied or assessed against the Shopping Center (land, buildings and improvements), and other taxes arising out of the use and/or occupancy of the Leased Premises imposed by federal, state or local governmental authority or any other taxing authority having jurisdiction over the Shopping Center (including expenses, directly incurred by Landlord in contesting the validity of, in seeking a reduction in, or in seeking to prevent an increase in any such tax(es) or assessment(s) only to the extent of Tenant's share of savings), but shall exclude franchise, capital stock, estate or inheritance taxes personal in nature to Landlord and income taxes.

Tenant shall pay all real estate taxes thirty (30) days before Landlord can last pay said taxes without penalty or interest.

2. Section 2.4 provides:

Common Area and Other Charges. Subject to the provisions of Section 7.1, all common areas and other common facilities (hereinafter collectively called 'common areas') made available by Landlord in or about the Shopping Center shall be subject to the exclusive control and management of Landlord, expressly reserving to Landlord, without limitation, the right to erect and install within the enclosed malls or the parking areas, kiosks, planters, pools, sculpture, free-standing buildings, additional stories to buildings, or otherwise. Common areas (as initially constructed or as the same may at any time thereafter be enlarged or reduced) shall mean all areas, space, facilities, equipment, signs and special services from time to time made available by Landlord for the common and joint use and benefit of Landlord, the Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and invitees, which may include (but shall not be deemed a representation as to their availability) the sidewalks, parking areas, access roads, driveways, landscaped areas, truck serviceways, tunnels, loading docks, pedestrian malls (enclosed or open), courts, stairs, ramps, elevators, escalators, comfort and first aid stations, public washrooms, community hall or auditorium and parcel pick-up stations. Landlord hereby expressly reserves the right from time to time, to construct, maintain and operate lighting and other facilities, equipment and signs on all of said common areas; to police the same; to change the area, level, location and arrangement of the parking areas and other facilities forming a part of said common areas; to building [sic] multi-story parking facilities; to restrict parking by tenants and other occupants of the Shoping [sic] Center and their employees, agents, subtenants, concessionaires and licensees to enforce parking charges (by operation of meters or otherwise), but in such event the net proceeds from such charges, after deducting the cost of enforcing the same or charges thereon by governmental authority, shall be applied in reduction of the cost of maintaining the common areas except when multi-story parking facilities are constructed by Landlord after the initial grand opening of the Shopping Center; to close temporarily all or any portion of the common areas for the purpose of making repairs or changes thereto and to discourage non-customer parking; to establish, modify and enforce reasonable rules and regulations with respect to the common areas and the use to be made thereof; and to grant individual tenants the right to conduct sales in the common areas. Landlord shall operate, manage, equip, light and maintain the common areas in such manner as Landlord may from time to time determine, and Landlord shall have the right and exclusive authority to employ and discharge all personnel with respect thereto. Tenant is hereby given a license (in common with all others to whom Landlord has or may hereafter grant rights) to use, during the Term, the common areas of the Shopping Center as they may now or at any time during the Term exist, provided, however, that if the size, location or arrangment of such common areas or the type of facilities at any time forming a part thereof be changed or diminished, Landlord shall not be subject to any liability therefor, nor shall Tenant be entitled to any compensation or diminution or abatement of rent therefor, nor shall such change or diminution of such areas be deemed a constructive or actual eviction. In order to establish that the Shopping Center and any portion thereof is and will continue to remain private property and to prevent a dedication thereof or the accrual of any rights to any person or the public therein, Landlord hereby reserves the unrestricted right to close all or any portion of the Shopping Center owned, leased or con-

LaSalle to alter the common areas; this alteration may clearly involve an enlargement or a reduction in the size of the common area. Section 2.4 is expressly subject to the provisions of section 7.1 [3] which authorizes LaSalle to make major altera-

trolled by Landlord to the general public for one (1) day in each calendar year, and, in connection therewith, to seal off all entrances to the Shopping Center, or any portion thereof. Tenant hereby acknowledges, consents and agrees that any and/or all services, facilities and access by the public to the Leased Premises and/or to the Shopping Center may be suspended in whole or in part during such temporary times as any of the department stores in the Shopping Center are not open for business, on legal holidays, or such other days as may be declared by local, state or federal authorities as days of observance, and/or during any periods of actual or threatened civil commotion, insurrection or other circumstances beyond Landlord's control.

Landlord shall maintain the common areas in good order, condition and repair. Tenant hereby agrees to pay Landlord a share, computed as hereinafter provided, of the operating costs (as hereinafter defined) of maintaining the common areas and Shopping Center. 'Operating Costs' shall mean the total cost and expense incurred in operating, maintaining and repairing the common areas, including without limitation, surcharges levied upon or assessed against parking spaces or areas, payments toward mass transit or car pooling facilities or otherwise as required by federal, state or local governmental authorities; costs and expenses in connection with maintaining federal, state or local governmental ambient air and environmental standards, the cost of all materials, supplies and services purchased or hired therefor; the cost and expense of landscaping, gardening and planting, cleaning, painting (including line painting), decorating, paving, lighting, sanitary control, removal of snow, trash, garbage and other refuse; heating, ventilating and air conditioning of the enclosed malls and other enclosed portions of the common areas; fire protection; water and sewerage charges; the costs of all types of insurance coverages carried by Landlord covering the common areas and Shopping Center, including, without limitation, public liability, personal and bodily injury and property damage liability and automobile coverage, fire and extended coverage, vandalism and malicious mischief and all broad form coverages, sign insurance and any other insurance that may be carried by Landlord covering the common areas and Shopping Center all in limits and with deductibles selected by Landlord; operation of loudspeakers and any other equipment supplying music to the common areas or any parts thereof; operation of public toilets; installing and renting of signs; maintenance, repair and replacement of utility systems serving the common areas, including water, sanitary sewer and storm water lines and other utility lines,

pipes and conduits; depreciation of machinery and equipment owned and used in operation, maintenance and repair of the common areas, or the rental charges for such machinery and equipment; the cost of personnel (including applicable payroll taxes, workmen's compensation insurance and disability insurance) to implement all of the foregoing, including the policing of the common areas and the directing of traffic and parking of automobiles on the parking areas thereof; administrative costs attributable to the common areas (but there shall be excluded initial costs of equipment properly chargeable to capital account consisting of items real estate in nature and the original cost of constructing the common areas). Landlord may cause any or all of said services to be provided by an independent contractor or contractors. Tenant's share of such Operating Costs shall be computed and paid in the same manner as provided with respect to taxes in Section 2.3 above, substituting the amount of Operating Costs for the amount of real estate taxes for the purposes of making such computation.

3. Section 7.1 provides:

By Landlord. In the event Landlord shall hereafter determine during the Term to erect additional structures, add stories to existing buildings, enclose open courts and malls in the Shopping Center (or any portions thereof as may be designated by Landlord) as said Shopping Center may be enlarged or reduced (provided same does not affect Tenant's business materially) at the reasonable discretion of Landlord by addition(s) to the Shopping Center of land and/or buildings or by the diminution thereof, Tenant hereby consents thereto and to the performance of work necessary to effect the same and any inconvenience caused thereby. The design, materials and performance of necessary work therefor shall be in the sole unrestricted discretion of Landlord. In the event Landlord elects to construct the improvements set forth in this paragraph, then common area improvements shall be deemed to include all such additional heating, ventilating, air-conditioning, sprinklering equipment, and other improvements and the costs of the common areas shall be deemed to include (but not be limited to) all costs and expenses incurred by Landlord in heating, ventilating, air conditioning and sprinklering said additional enclosed or partially enclosed mall areas as well as expenses incurred in the repair and maintenance of said additional heating, ventilating and air conditioning equipment, including depreciation thereof. Notwithstanding the foregoing, Landlord shall not build buildings in the areas outlined in red on Exhibit A.

tions to the Shopping Center, including the addition of new structures or the addition of new floors to existing structures.

Section 7.1 states that LaSalle cannot build in the area "outlined in red on Exhibit A." In 1978, the Bank desired to build in the "red outlined area." It sought and obtained the consent of Service Merchandise to do so. However, the contemplated construction also required a zoning variance from the village. To obtain the variance, LaSalle proposed to close off the second floor of a then-vacant building to all uses except for access for the maintenance of mechanical equipment. The village approved the variance by adopting an ordinance that required that this second floor of the building (70,000 square feet) be closed off in accordance with the proposal. To comply with the ordinance, the Bank also had to make many changes that rendered the space structurally nonleasable as well as legally nonleasable.

The Bank notified Service Merchandise that it intended to subtract the 70,000 square feet from the denominator of the tax/CAM payment fraction. Service Merchandise disagreed. This litigation followed.

### The Decision of the District Court

The district court determined that the contract was ambiguous. The court found the language vague with respect to the nature and extent of the landlord's right to reduce leasable space. Indeed, the district judge believed the question of whether the agreement allowed the landlord to reduce the leasable space at all was a matter in dispute. Furthermore, the court found that the lease was ambiguous with respect to the tenant's right not to have its business materially affected by any diminution of leasable space by the landlord.

After a bench trial, in which a good deal of parol evidence was admitted, the district court concluded that section 7.1 of the contract does not permit the landlord to change existing physical space to non-leasa-

ble space. Indeed, the court held that the section simply did not deal with that question and noted that none of the witnesses had testified that there was any discussion about this subject with respect to section 7.1. The court noted that all of the witnesses had agreed that the parties' discussion regarding section 7.1 concerned physical alterations. Consequently, the district court concluded that section 7.1 did not create the right of the landlord to change existing leasable space to non-leasable space.

The district court acknowledged that, as a general rule, a landlord has the right to manage his property, except as limited by lease. However, relying on *Metropolitan Airport Auth. v. Farliza Corp.,* 50 Ill. App.3d 994, 8 Ill.Dec. 950, 366 N.E.2d 112 (1977), the court held that, before a landlord may alter the property in a way that would increase the tenant's taxes, there must be a "clear and concise," *LaSalle Nat'l Bank v. Service Merchandise Co.,* No. 80 C 6185, mem. op. at 3 (N.D.Ill. Jan. 31, 1986) [Available on WESTLAW, DCT database]; R. 133 at 3–4 [hereinafter cited as Mem. op.], provision permitting such an increase:

[I]n the absence of a clear affirmative right on the part of the landlord to increase the tenant's share of the taxes by eliminating leasable space in a non-physical way, I take it that the landlord does not have that right.

R. 144 at 4.

The district court then opined that, had the Shopping Center been reduced in size by "involuntary reductions, such as by condemnation or destruction by fire,"[4] *id.* at 6, it would have been a permissible reduction of leasable space for purposes of tax allocation:

[D]iminution and destruction of buildings I think was a risk that the defendants took. Physial [sic] diminution was a risk that they took, and had we had a

---

4. The district court later amended this statement to include voluntary destruction. *LaSalle Nat'l Bank v. Service Merchandise Co.,* No. 80 C 6185, mem. op. at 1–3 (N.D.Ill. Jan. 31, 1986) [Available on WESTLAW, DCT database]; R. 133 at 1–3.

physical destruction of a building, we would analyze it under 7.1.

*Id.* at 8.

Here, however, there was no diminution or destruction of a building but simply withdrawal from leasable space. Therefore, the court held, the denominator in the tax equation could not reflect such a withdrawal.

In short, in the district court's view, the lease does not permit the landlord voluntarily to change existing physical space to non-leasable space except as specifically provided in the lease. According to this view, if the landlord voluntarily chooses to alter the use of physical space so that it cannot be leased, the space must still be considered "leasable" within the meaning of the contract so long as the space is physically available. Moreover, in computing the tenant's percentage liability of the space and CAM assessments, space that physically exists would be considered leasable and be considered within the denominator.[5]

### Governing Principles

 Where our jurisdiction is based on diversity of citizenship, *see* 28 U.S.C. § 1332, the resolution of substantive issues is determined by the applicable state law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See generally Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties are in agreement that the applicable state law is the law of Illinois. Therefore, in interpreting this contract, we must follow the applicable Illinois principles of contract construction. *See Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 n. 2 (7th Cir.1987). Recently, in *Airline Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.*, 763 F.2d 875 (7th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986), this court had occasion to set forth the basic principles of Illinois law regarding the construction of contracts. There, the court noted that "[t]he primary object in construing a contract is to give effect to the intention of the parties." *Id.* at 877 (citing *Schek v. Chicago Transit Auth.*, 42 Ill.2d 362, 247 N.E.2d 886, 888 (Ill.1969)). The starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over. *Id.* at 878. The question of whether a contract is ambiguous is a conclusion of law and may be reviewed *de novo* by the court on appeal. *Id.* (citing *National Tea Co. v. American Nat'l Bank & Trust Co.*, 100 Ill.App.3d 1046, 50 Ill.Dec. 474, 427 N.E.2d 806, 808 (Ill.App.Ct.1981)). If the trial court determines that the contract is unambiguous, it must then go on to declare its meaning. Such a declaration is also a conclusion of law and may be reviewed *de novo*. *Id.* On the other hand, if the court holds that the contract is ambiguous, its meaning becomes a question of fact and must be submitted to the trier of fact. *Id.* (citing *Hagerty, Lockenvitz, Ginzkey & Assocs. v. Ginzkey*, 85 Ill.App.3d 640, 40 Ill.Dec. 778, 406 N.E.2d 1145, 1146 (1980)). Under these circumstances, the trier of fact considers not only the language of the contract but also any extrinsic or parol evidence presented by the parties. Its determination is a finding of fact and this court must review that finding of fact under the clearly erroneous standard. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

### DISCUSSION

We believe that the district court correctly understood the basic analytical framework for the interpretation of contracts under Illinois law. However, we also believe that its painstaking analysis of the evidentiary submissions of the parties was unnecessary because, in our view, the text of the lease agreement is not ambiguous[6]

---

**5.** The district court also determined that the second perceived ambiguity in section 7.1 ... "the proviso about not affecting the tenant's business ... has nothing to do with this case." R. 144 at 4.

**6.** Service Merchandise claims that the appellant has waived the right to argue that the lease is

and there is no need to resort to parol evidence.

■ In determining whether the language of a lease is unambiguous, we must remember that, while modern real estate practice has shed a good many of the cumbersome conventions of yesteryear, commercial leases rarely contain the sort of clear, concise prose which wins legal writing awards. Nor are they usually organized in a manner that makes their interpretation expeditious and convenient. This lease is no exception. However, an examination of the entire text of this agreement, as well as an examination of its overall structure, convinces us of one important factor: the drafters of this instrument— the parties in this case—made a basic determination that taxes would be allocated according to a floating formula. The lease makes it clear that the parties understood that the space in the shopping center might increase or decrease during the term of the lease, and it was also understood that the responsibility of the defendant tenant would remain that percentage of the overall leasable space allocated to it.

At the time that the lease was drawn, the parties may well have believed that there was a greater possibility that the leasable space in the shopping center would increase rather than decrease and that the major risk to the tenant in this regard was that the shopping center would contain space which, while leasable, was not leased. However, the opposite possibility also existed and the parties did not eliminate it. Indeed, in our view, the language and structure of the contract demonstrate that they affirmatively tolerated such a contingency. Therefore, the tenant took the risk that, while the total tax bill remained the same or increased, the shopping center might contain less leasable space and that, therefore, its share of the bill would increase.

The lease expressly contemplates both the expansion and diminution of the size of the shopping center in section 7.4. Indeed, the district court expressly recognized this feature but limited the possibility of reduction, on the basis of parol evidence, to those situations where space is totally removed, voluntarily or involuntarily. In our view, neither the language nor the overall structure of the lease permits such a narrow interpretation of the lease agreement. The lease, read in its entirety, contemplated both the possibility of increase and the possibility of decrease in the amount of leasable space. The tenant, in agreeing to pay the percentage of taxes and CAM charges that corresponded to its percentage of overall leasable space, assumed the risk that such changes in costs associated with such changes in space would reflect its business benefit from the lease arrangement.

The district court's construction of the contract was influenced, to a significant extent, by its reading of *Metropolitan Airport Auth. v. Farliza Corp.*, 50 Ill.App.3d 994, 8 Ill.Dec. 950, 366 N.E.2d 112 (1977). In the district court's view, that case stands for the proposition that "in order for the tax burden on defendant to be increased ... the lease provisions permitting such increase must be clear and concise." Mem. op. at 2–3. The district court therefore concluded that, since the lease provisions "do not unambiguously indicate that alteration of physical space, short of complete demolition, renders the space 'nonleasable,' thereby possibly increasing

---

unambiguous since LaSalle did not appeal Judge Getzendanner's September 1, 1983 order vacating Judge Flaum's earlier grant of summary judgment and because it has not "contended on appeal that [Judge Getzendanner] erred by considering parol evidence to ascertain the intent of the parties." Appellee's Br. at 15.

We do not believe that LaSalle is barred from making such an argument. Judge Getzendanner's order of September 1, 1983 was not appealable. While LaSalle's presentation in this court is not a model of clarity, we believe that it did preserve sufficiently the contention that the lease should be construed, within its four corners, as permitting the allocation that LaSalle urges here. In any event, since "the primary object in construing a contract is to give effect to the intention of the parties," *Airline Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.*, 763 F.2d 875, 877 (7th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986), we must always begin our construction of the contract by reference to the text.

tax liability ... the altered space is still 'leasable' within the meaning of the lease." *Id.* at 3.

We do not believe that the holding of *Metropolitan Airport Auth.* governs this case. *Metropolitan Airport Auth.* involved a lease between an airport authority and a hotel. The lease provided that the lessee would pay taxes upon any of the lessee's property or improvements on the premises. There was no provision for real estate taxes. The property was exempt because it was being used for airport authority purposes. However, when it was no longer used for such purposes, the county sought to tax the real estate. The court held that the airport authority could not impose this tax liability upon the lessee without a specific agreement authorizing the assumption of such a liability by the lessee. The situation before us is substantially different. The lessor is not seeking to have the tenant pay taxes not provided for in the lease despite the fact that the lease already specifically sets forth the lessee's tax liability. Here, there is simply an increase, pursuant to a specified formula, of a tax for which the lessee is already responsible.

## CONCLUSION

Because we believe that the lease agreement is unambiguous,[7] we reverse the judgment of the district court.

REVERSED.

---

7. Because we hold that the lease is unambiguous and permits the allocation of taxes and CAM charges to the defendant, we need not address LaSalle's argument, relied upon by Judge Flaum in the initial hearing in the district court, that the village ordinance made the space in question nonleasable.