**METALEX CORPORATION, an Illinois corporation, Plaintiff–Appellee,**

v.

**UNIDEN CORPORATION OF AMERICA, a foreign corporation, Defendant–Appellant.**

No. 87–2282.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1988.

Decided Dec. 9, 1988.

Elsie G. Holzwarth, Chicago, Ill., for defendant-appellant.

Barbara J. Stuetzer, Katten Muchin & Zavis, Chicago, Ill., for plaintiff-appellee.

Before POSNER, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

Uniden Corporation of America (Uniden) appeals the district court's grant of summary judgment against it and in favor of Metalex Corporation (Metalex) in a contract dispute. We reverse and remand.

## I.

Uniden, whose businesses include selling television satellite receiver systems to consumers, agreed in December, 1984, to buy receiving antennas from International Video Communications Corporation (IVC). A few days later, on January 1, 1985, IVC agreed to buy mesh panels from Metalex to use in manufacturing the antennas IVC was to sell to Uniden. As a condition of the Purchase Agreement between IVC and Metalex, Uniden agreed to guarantee IVC's payment and performance under the Purchase Agreement with Metalex.

The Purchase Agreement between IVC and Metalex provided that between January 1, 1985 and March 31, 1986, IVC was to purchase not less than 80,000 "units" (a unit consisting of four panels) from Metalex. The Purchase Agreement further provided that concurrently with executing the agreement, IVC was to place a purchase order with Metalex for the initial 19,500 units "for delivery during the first two calendar quarter [sic] of 1985 as follows:"

| | | | |
|---|---|---|---|
| January | 500 units | ( 9,000 | panels) |
| February | 1,200 units | ( 27,000 | panels) |
| March | 2,500 units | ( 45,000 | panels) |
| April | 4,000 units | ( 72,000 | panels) |
| May | 5,000 units | ( 90,000 | panels) |
| June | 6,000 units | (108,000 | panels) |

IVC agreed to place additional purchase orders for delivery of the remaining units during calendar quarters beginning July 1, 1985. The Purchase Agreement further provided that Uniden was to countersign all of IVC's purchase orders. Uniden's Guaranty also provided for Uniden's countersignature on IVC's purchase orders as a condition precedent to Uniden's liability under the Guaranty.

Although goods were delivered, Uniden never countersigned any document specifically denominated "purchase order." Instead, on March 19, Uniden sent an executed copy of the Guaranty to Metalex, accompanied by a letter from Harold Ducote, Uniden's general counsel. The letter confirmed "Uniden's acquiescence to the purchase schedule through June, 1985 as contained in the aforementioned Agreement and the terms and conditions thereof." Uniden and Metalex agree that Ducote sent the letter in lieu of countersigning a purchase order. They disagree, though, about the letter's effect. Uniden contends that it meant only to extend its Guaranty to units delivered before July 1, 1985. Metalex, on the other hand, contends that the letter can only be reasonably interpreted as guaranteeing payment for the initial 19,500 units set out in the delivery schedule in the Purchase Agreement no matter when those units were delivered.

On August 29 and September 4, 1985, Metalex issued five invoices for mesh panels that it shipped to IVC. The total amount due for those units was $170,597.69. IVC never paid Metalex for those panels. In October, 1985, Metalex notified

Uniden that IVC had not paid the invoices and requested that Uniden pay pursuant to the Guaranty. Uniden did not pay, and in March, 1986, Metalex filed this lawsuit against IVC and Uniden.

IVC defaulted and is not a party to this appeal. In October, 1986, after completing its discovery against Uniden, Metalex filed a motion for summary judgment. Uniden filed a cross-motion for summary judgment. The district court held that in the March 15 letter from Ducote, considered with the Guaranty and Purchase Agreement, Uniden agreed to guarantee the initial 19,500 units designated for delivery by June 30, 1985, even if those units were delivered after that date. The district court also found that no fact issue existed regarding whether the units at issue in this case were part of the initial 19,500 units. The district court accordingly entered summary judgment for Metalex. Uniden appeals that judgment.

## II.

The Guaranty provides, and the parties agree, that Illinois law governs. In interpreting a contract under Illinois law, a court must first decide whether or not the contract is ambiguous. That is a question of law which we review *de novo*. *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987); *National Tea Co. v. American Nat'l Bank and Trust*, 100 Ill.App.3d 1046, 56 Ill.Dec. 474, 476, 427 N.E.2d 806, 808 (1st Dist.1981). If the court determines the contract is unambiguous, the court must then declare the contract's meaning. That declaration is also a question of law. *LaSalle Nat'l Bank*, 827 F.2d at 78. But if the court finds that the contract is ambiguous, the contract's meaning becomes a fact question for the trier-of-fact. *Id.*

Contract interpretation is a subject particularly suited to disposition by summary judgment. Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56. If a contract is unambiguous, by definition no material issues of fact exist

regarding the contract's interpretation; that interpretation is a question of law for the court.

Metalex contends that the Purchase Agreement, Guaranty, and Ducote's March 15 letter unambiguously establish that Uniden agreed to guarantee IVC's payment for the initial 19,500 units delivered under the Purchase Agreement, no matter when delivered. Uniden, on the other hand, contends that these three documents unambiguously establish that Uniden only guaranteed units *delivered* before July 1, 1985; for units delivered after that date, Uniden's Guaranty applied only if Uniden countersigned purchase orders for those units. Since the invoices at issue here were dated after June 30, 1985, and Uniden never countersigned purchase orders for those shipments, Uniden contends that it had no obligation to pay for those units. Uniden argues alternatively that the contract documents are ambiguous, and that a material issue of fact exists regarding their interpretation.

The Guaranty itself is unambiguous (despite the fact that it is written in stultifying legalese). Uniden agreed to guarantee payments due from IVC to Metalex on purchase orders "executed by IVC and countersigned by [Uniden]." Uniden also waived notice of modifications in the delivery schedule for IVC's purchases, and agreed that Metalex and IVC could modify the delivery schedule without affecting Uniden's obligation under the Guaranty. Thus, if Uniden had countersigned a purchase order for the initial 19,500 units, Uniden would be obliged to guarantee IVC's payments for those units no matter when Metalex delivered them. Likewise, if Uniden did not countersign any purchase orders, it would not be liable under the Guaranty alone.

■ The problem here is that instead of countersigning any document specifically denominated a "purchase order," Uniden sent Metalex Ducote's March 15 letter "acquiesce[ing] to the purchase schedule through June 1985 as contained in the [Purchase] Agreement and the terms and conditions thereof." Reading Ducote's letter in

isolation, it is possible to interpret it as saying that Uniden was guaranteeing IVC's payments only through June, 1985 and, therefore, was not guaranteeing payment for units IVC purchased after June, 1985. But we cannot read Ducote's letter in isolation; in determining whether a contract is ambiguous (that is, whether it can reasonably be interpreted more than one way) we must examine the contract as a whole. *United Equitable Ins. Co. v. Reinsurance Co. of America,* 157 Ill.App.3d 724, 109 Ill.Dec. 846, 890, 510 N.E.2d 914, 918 (1st Dist.), *appeal dismissed,* 117 Ill.2d 554, 115 Ill.Dec. 410, 517 N.E.2d 1096 (1987). Ducote's letter specifically mentioned, and was accompanied by, the written Guaranty executed by Metalex, and specifically incorporated the Purchase Agreement's "terms and conditions." The Guaranty, the Purchase Agreement, and Ducote's letter are all interrelated parts of a contemporaneous transaction, and constitute the contract between Metalex and Uniden. We must therefore read Ducote's letter in the context of the Guaranty and Purchase Agreement.

A contract is ambiguous under Illinois law only if it is *"reasonably* and *fairly* susceptible to more than one meaning." *Lenzi v. Morkin,* 116 Ill.App.3d 1014, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1st Dist.1983) (emphasis added), *aff'd,* 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984). Applying that standard to Ducote's letter, the Purchase Agreement and the Guaranty lead us to agree with Metalex that these documents unambiguously establish that Uniden agreed to guarantee IVC's payment for the initial 19,500 units delivered, no matter when delivered. As the district court noted, if Ducote had intended to limit Uniden's guarantee to actual deliveries made by June 30, he could have easily said so. Ducote's rather opaque reference to "the purchase schedule through June 1985" is strange language to use to limit Uniden's liability to deliveries made by that date, given the Purchase Agreement's and Guaranty's terms. The Purchase Agreement allowed IVC and Metalex to modify their delivery schedule. In the Guaranty, Uniden specifi-

cally waived notice of any modification to the delivery schedule, and agreed that any modifications would not affect its liability under the Guaranty. By acquiescing in the Purchase Agreement's terms, and by executing the Guaranty, Uniden agreed that IVC and Metalex could modify the delivery schedules without affecting Uniden's liability. Uniden's interpretation of Ducote's letter is simply inconsistent with the contract terms it agreed to, and is thus unreasonable. *Cf. United Equitable Ins.,* 109 Ill. Dec. at 890, 510 N.E.2d at 918.

Our conclusion thus far has been based only on the contract documents; we have not considered any extrinsic evidence. Uniden, however, submitted several other documents in the district court that it claims show that the Ducote letter is ambiguous and that raise the inference that Uniden and Metalex actually agreed that Uniden was only guaranteeing payment for actual deliveries made by June 30. The two most important of these documents are an affidavit by Ducote and a letter dated March 21, 1985 to IVC's president from Robert Siegel, Metalex's vice president. Ducote's affidavit states that Metalex and Uniden intended to hold Uniden liable only for actual deliveries made through June, 1985. Siegel's letter states, in pertinent part, that "Uniden's guarantee is good only thru June, 1985. After that date, Uniden must countersign purchase orders."

Standing alone, Ducote's affidavit is meaningless. The affidavit gives no clue as to how Ducote would know the subjective intent of anybody from Metalex. And while it might have been Ducote's subjective intent that Uniden only guarantee payment for actual deliveries made by June 30, that intent is immaterial if it was not disclosed to Metalex. *See Robbins v. Lynch,* 836 F.2d 330, 332 (7th Cir.1988). The affidavit does not state that Ducote ever told the relevant people at Metalex about his intent. Moreover, his March 15 letter, when read in the context of the Purchase Agreement and Guaranty, did not reasonably convey that intent to Metalex. Uniden cannot escape liability founded upon a document that can only objectively be read to

say "we guarantee payment for the initial 19,500 units no matter when delivered" by stating that the document's author *really* meant to say "we guarantee payment only for deliveries made by June 30."

Siegel's letter, however, is different. As Metalex's litigation position demonstrates, it is in Metalex's interest to interpret the agreement between it and Uniden as saying that Uniden would guarantee payment for the initial 19,500 units no matter when delivered. One could read Siegel's letter, however, as representing an interpretation of the agreement by Metalex that is the opposite of Metalex's desired interpretation and consistent with Uniden's interpretation (although, we hasten to add, the letter does not compel that reading). Siegel's letter raises the inference that Ducote or somebody at Uniden did actually convey Uniden's intent to Metalex, and that Metalex shared that intent.

The district court did not consider Siegel's letter. But a question exists regarding whether the district court should have considered the letter (or any other extrinsic evidence). The traditional test for determining whether a contract is ambiguous is the "four corners" or "plain meaning" test. Under this test, a written agreement is " 'presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.' " *URS Corp. v. Ash,* 101 Ill.App.3d 229, 56 Ill.Dec. 749, 753, 427 N.E.2d 1295, 1299 (4th Dist.1981) (quoting *Western Illinois Oil Co. v. Thompson,* 26 Ill.2d 287, 291, 186 N.E.2d 285, 287 (1962)); *see also Sheridan v. James W. Rouse and Co.,* 109 Ill.App.3d 841, 65 Ill.Dec. 512, 515, 441 N.E.2d 647, 650 (1st Dist.1982). It follows that under the "four corners" test, a court should not consider extrinsic evidence in determining whether a contract is ambiguous. *See* John D. Calamari & Joseph M. Perillo, *Contracts* § 3–10, at 166–67 (3d ed.1987).

A number of Illinois appellate court cases, however, have held that a court may consider extrinsic evidence in determining whether a contract is ambiguous. *See, e.g.,* *Ash,* 56 Ill.Dec. at 754, 427 N.E.2d at 1300; *see also Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258, 1268 (7th Cir.1984) (citing cases). Since our decision in *Sunstream,* this court has consistently interpreted Illinois law as allowing a court to consider extrinsic evidence in determining whether a contract is ambiguous. *See id.; In re Pearson Bros. Co.,* 787 F.2d 1157, 1161 (7th Cir.1986); *Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987).

Shortly after *Sunstream,* the Illinois Supreme Court decided *Rakowski v. Lucente,* 104 Ill.2d 317, 84 Ill.Dec. 654, 472 N.E.2d 791 (1984). In *Rakowski,* the supreme court held that where a contract is unambiguous on its face

> [b]oth the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids.... "What the parties to a written contract may have understood as to the meaning of the language used is not admissible in evidence. The intention or understanding of the parties, when there is a written contract in evidence, must be determined not from what the parties thought but from the language of the contract itself."

*Id.* 84 Ill.Dec. at 657, 472 N.E.2d at 794 (quoting *Saddler v. National Bank,* 403 Ill. 218, 228, 85 N.E.2d 733, 740 (1949)). *Rakowski* casts some doubt on this circuit's interpretation of Illinois law allowing a court to consider extrinsic evidence when determining whether a contract is ambiguous.

*Rakowski* did not specifically state that a court may not consider extrinsic evidence in determining whether a contract is ambiguous. But the language it used is fairly susceptible to that interpretation, and at least one Illinois appellate court case has cited *Rakowski* for the specific proposition that a court may not consider extrinsic evidence in determining whether a contract is ambiguous. *See United Equitable Ins.,* 109, Ill.Dec. at 890–91, 510 N.E.2d at 918–19 (rejecting the cases cited in *Sunstream* ). Interestingly enough, however,

the same appellate court, in an opinion after *Rakowski* (but before *United Equitable Ins.*) written by the author of *United Equitable Ins.*, stated that a court *may* consider extrinsic evidence in determining whether a contract is ambiguous. *Zale Construction Co. v. Hoffman*, 145 Ill. App.3d 235, 98 Ill.Dec. 708, 712, 494 N.E.2d 830, 834 (1st Dist.1986).

The parties have not addressed this apparent split in Illinois authority, and we are hesitant to reconcile the Illinois cases (and our own cases interpreting Illinois law) without the benefit of the parties' arguments. For that reason, and also because we normally give substantial weight to a district judge's interpretation of the law of the state in which he sits, *Moore v. Tandy Corp.*, 819 F.2d 820, 823 (7th Cir.1987), *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987), we think it best to allow the district court to address this issue, after hearing Uniden's and Metalex's arguments.

■ Another reason for allowing the district court to have the first shot at reconciling the apparent conflict in the Illinois cases is that we are reversing the summary judgment for Metalex and remanding anyway. Even under Metalex's interpretation of the contract documents, Metalex must prove that the units at issue here are part of the initial 19,500 units specified in the Purchase Agreement for anticipated delivery by the end of June, 1985. Summary judgment for Metalex is only appropriate if Metalex shows that no genuine issue exists about whether the units at issue here are part of the initial 19,500 units. Fed.R. Civ.P. 56; *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). Metalex did not meet its burden on this issue.

Metalex submitted an affidavit by Robert Siegel to support its summary judgment motion. That affidavit stated, in pertinent part, that

> [t]he invoices [upon which Metalex based its claim for payment] relate to mesh panels ... sold by Metalex to International Video Communications Corporation pursuant to a Purchase Agreement

> dated January 1, 1985.... *Those panels are within the purchase schedule set forth in Section III of the Purchase Agreement.*

Metalex argues that this affidavit, unrebutted by Uniden, conclusively establishes that the units at issue were part of the initial 19,500. We think not.

In the affidavit, Siegel could have clearly stated that the units were part of the initial 19,500 or that the units were among those originally designated for delivery by June 30, 1985. Instead, the affidavit is ambiguous on this point, and raises conflicting inferences. Section III of the Purchase Agreement refers both to the initial 19,500 units and to subsequent deliveries of additional units. The key question is, what does "purchase schedule" mean? "Purchase schedule" could mean the anticipated delivery schedule for the initial 19,500 units. However, since Section III of the Purchase Agreement also provides for subsequent deliveries of a specified number of additional units and the time frame in which Metalex was expected to deliver those additional units, "purchase schedule" could refer to the 80,000 total units that Metalex was to eventually sell to IVC under the Purchase Agreement.

Metalex has directed us to nothing in the record that demonstrates that "purchase schedule" necessarily refers to the anticipated delivery schedule for the initial 19,500 units. Moreover, the invoices attached to Siegel's affidavit all bear the legend "Cash in Advance." This raises the inference that Uniden's Guaranty was not in effect at the time IVC purchased the units at issue; if Uniden was guaranteeing payment there seems to be little reason why Metalex would demand payment from IVC before shipping the units. It is thus possible to reasonably infer that Siegel's affidavit simply means that the units at issue were among the total number of units that IVC was to purchase under the agreement. Siegel's affidavit does not conclusively establish that the units at issue were among the initial 19,500.

It is possible—perhaps likely—that Siegel's affidavit really meant to say what

Metalex says it does. But argument is no substitute for evidence; the affidavit raises conflicting inferences, and we must give Uniden the benefit of all reasonable inferences, so summary judgment for Metalex on the present record is inappropriate. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Big O Tire Dealers*, 741 F.2d at 163.

The Siegel affidavit's ambiguity is particularly troubling given that Metalex consistently resisted discovery concerning whether the units at issue were among the initial 19,500. Before Metalex filed its summary judgment motion, Uniden had submitted an interrogatory asking Metalex to set out certain information about all invoices from Metalex to IVC for goods purchased pursuant to the Purchase Agreement. Uniden had also asked IVC to produce documents regarding delivery of units to IVC. Metalex resisted this discovery, except as it related to the specific invoices for the units for which it is seeking payment. Uniden moved the district court to compel discovery; the court ordered Metalex to produce the documents but did not order Metalex to answer the interrogatory.

Uniden asserts, as it asserted in the district court, that the documents Metalex produced were a "crazy-quilt" and "show[ed] a hodge-podge of shipments consisting of what appear to be numerous back orders and repeated instances of nonconformity to the Purchase Agreement." (The documents are not in the record, so we cannot check the accuracy of this claim. Metalex, however, has not asserted that the documents it produced were not confusing.) To clear up the confusion, Uniden attempted to take the depositions of some of Metalex's corporate officers. Metalex filed a motion for protective order asking the district court to prohibit Uniden from taking those depositions; the court granted the motion.

If, as Uniden alleges, the documents Metalex produced were a confusing mishmash from which it was difficult, if not impossible, to determine whether the units at issue were part of the initial 19,500, the depositions Uniden requested, as well as the answer to Uniden's interrogatory, might have clearly established that the units at issue were among the initial 19,500. It is difficult for us to see why Metalex would not be more forthcoming if clarifying the documents would have supported its claim, particularly since the Guaranty provided that Uniden would have to pay the bills Metalex incurred in collecting from Uniden. Metalex's resistance to discovery seems to reinforce Uniden's argument that Siegel's affidavit does not say what Metalex says it does.

On remand, the district court should allow discovery concerning whether the units at issue here were among the initial 19,500. This is not an invitation for Uniden to engage in a fishing expedition; the district court may, in its discretion, appropriately limit any discovery.

For the reasons stated above, we reverse and remand the district court's order for further proceedings consistent with this opinion.

REVERSED AND REMANDED.