Michael HICKEY, Fred Jung, Michael Crowley, et al., Plaintiffs–Appellants,

v.

A.E. STALEY MANUFACTURING, formerly known as Staley Continental Incorporated, formerly known as CFS Continental, Defendant–Appellee.

No. 91–3584.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1992.

Decided June 1, 1993.

Allen Weissman (argued), Chicago, IL, for plaintiffs-appellants.

Mark A. Casciari (argued), Condon A. McGlothlen, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant-appellee.

Before BAUER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge,

Michael Hickey, Fred Jung, Michael Crowley, Leonard Wall and Vincent Vitucci ("the plaintiffs") sued A.E. Staley Manufacturing Company ("the defendant") after being denied severance benefits under the defendant's severance pay plan ("the Plan"). The district court granted summary judgment for the defendant finding that the plaintiffs failed to satisfy the Plan's definition of participant ("employed by and located at the headquarters office"). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., which authorizes federal court jurisdiction. Id. § 1132(e). We affirm.

## I. BACKGROUND

In November 1984, A.E. Staley ("Staley Manufacturing") acquired CFS Continental ("CFS"), a manufacturer and distributor of consumer goods and food products. Shortly thereafter, Staley created a new corporation, Staley Continental, Inc. ("SCI"), to serve as the parent and holding company of Staley Manufacturing and CFS. At this time, CFS was re-structured into three separate and distinct divisions: the CFS headquarters office (100 South Wacker Drive, Chicago, Illinois); the manufacturing division; and the distribution division. The plaintiffs in this case were employed at the manufacturing division and none of them were ever employed at the headquarters office on 100 South Wacker Drive.

The three divisions of CFS were not only geographically separated, but also fulfilled separate and distinct functions and maintained individual hierarchical structures. The CFS headquarters office group was known as the CFS headquarters staff, the CFS corporate staff, and "the Cohns' staff," (named after the chief officers of CFS, Rob-

ert and Alvin Cohn). Plaintiff Hickey testified that the CFS headquarters was located at 100 South Wacker Drive in Chicago, Illinois. The headquarters staff performed corporate administrative functions for all the divisions of CFS. The manufacturing division, located at 2550 North Clybourn Avenue in Chicago, Illinois, produced consumer products and foodstuffs. It was known as the CFS manufacturing group, the Staley Foodservice Company, the Staley Continental Foodservice Company, and "Hansen's staff," (named after its President, Don Hansen). The distribution division, located in Century City, California, distributed foodstuffs and consumer products. It was known as the CFS distribution group, the Continental foodservice division, the Continental Foodservice group and "Siegel's staff," (named for its President, Richard Siegel).

In 1986 and 1987, the plaintiffs were all employed in the manufacturing division on 2550 North Clybourn, Chicago, Illinois. The plaintiffs performed functions within the manufacturing division as part of "Hansen's staff." The plaintiff Michael Hickey, while reporting to Hansen, served as Vice President and Controller of the CFS manufacturing division from December 2, 1985 until his termination on October 31, 1988. The second plaintiff, Leonard Wall, reported to Hickey and acted as a financial analyst for Continental Coffee Products Company (a CFS manufacturing division company), and later served as Assistant Controller for the CFS manufacturing division until his termination on September 30, 1988. The third plaintiff, Fred Jung, also reported directly to Don Hansen while serving as Vice President of Planning and Development of CFS manufacturing division from February 3, 1986, until his discharge on August 31, 1988. The fourth plaintiff, Vincent Vitucci, reported to Hansen and was the Vice President of Management Information Systems for CFS manufacturing division from April 16, 1986 until his termination on November 30, 1988. Finally, the plaintiff Michael Crowley reported to Vitucci while managing systems development for CFS manufacturing division from July 2, 1986 until he was released on November 30, 1988.

In 1987 and 1988, SCI began negotiations to sell CFS (Tate & Lyle took over SCI in April 1988 and sold CFS to the Sysco Corporation in June 1988). In the course of the Sysco acquisition, the CFS headquarters office was moved from 100 South Wacker Drive, Chicago, Illinois, to another location in the One Continental Towers Building, in Rolling Meadows, Illinois. During this period of transition, the manufacturing division offices were moved to another floor of the One Continental Towers. The plaintiffs continued to work in the manufacturing division at the Rolling Meadows offices until their termination.

On April 7, 1987, in anticipation of a future takeover of CFS, SCI established The CFS Continental Severance Pay Plan to protect CFS headquarters employees. Staley's Vice President of Human Resources, Robert W. Pirsein directed Staley's human resources attorney, Mary E. Busch to draft the Plan, which he later approved. In affidavits filed with the district court, both Pirsein and Busch assert that Pirsein "intended the Plan to cover only the positions at the CFS headquarters' office in April 1987 ... because [they] believed that in the event of a takeover of CFS, the CFS headquarters' office positions would be less secure than the CFS divisional staff positions." Pirsein Affidavit ¶¶ 5–6 *in* Appellee's Appendix at 2; Busch Affidavit ¶ 6 *in* Appellee's Appendix at 8. At the time the Plan was written, CFS's headquarters office was still located at 100 South Wacker Drive, Chicago, Illinois. The "Purpose" section of the Plan states:

> Staley Continental, Inc. ("Company") has established the CFS CONTINENTAL SEVERANCE PAY PLAN (the "Plan") to provide certain employees of CFS Continental, a division of the Company ("CFS") minimum compensation and benefit rights in the event that employment is terminated as a result of change in corporate control.

Section I. The definitions section limits participation to

> any employee who (i) *is employed by and located at the headquarters office of CFS;* (ii) customarily works thirty-two or more hours per week; and (iii) is not entitled to

receive benefits from the company pursuant to a retention agreement.

Section II(2.1) (emphasis added).

The plaintiffs disagreed with Pirsein's and Busch's interpretation of the term "Participant" in the Plan ("to cover only the positions at the CFS headquarters' office in April 1987"), yet the plaintiffs failed to offer any evidence or affidavits to refute Staley's definition of "Participant." In fact, Hickey testified

> [W]e knew that the 100 South Wacker Drive was going to close and there was only going to be one corporate office. It's really at that time it's my understanding that when the initial severance pay plan was put together was because of that. They knew it was going to close and certain people would wind up leaving and certain would not.

Appellee's Brief at 12 (quoting Hickey Deposition at 21).

In February 1989, plaintiff Hickey filed a claim for benefits under the Plan and the plaintiff Crowley filed a similar claim two months later in April of 1989. Staley denied both of their claims in letters from the Manager of Compensation and Benefits. Plaintiffs Fred Jung, Leonard Wall, and Vincent Vitucci never saw fit to file separate benefit claims, but joined with Hickey and Crowley in filing this action against Staley.[1]

All of the plaintiffs were terminated from CFS after the Sysco acquisition. They argue that they are entitled to welfare benefits under the CFS severance Pay Plan because they were "employed by and located at the headquarters' office of CFS." Section II(2.1). The record reveals that no manufacturing or distribution division employees have ever received severance benefits under the Plan, but three distribution division employees negotiated "separation agreements" in order that they might receive some compensation upon their termination.

## II. ISSUES

The plaintiffs, on appeal, argue that the district court grant of summary judgment to the defendant was improper. Specifically, the plaintiffs claim that the trial court erred in determining that the Plan was intended to cover only corporate headquarters employees at 100 South Wacker Drive. Secondly, the appellants contend that the court erred in establishing an eligibility date for severance benefits of April 7, 1987.

## III. DISCUSSION

### A.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This court reviews "issues decided on summary judgment *de novo*, and ... resolve[s] all reasonable inferences in favor of the nonmoving party," *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir.1992), "[h]owever, the non-moving party may not simply rest on his pleadings, but must demonstrate by specific evidence that there is a genuine issue of triable fact." *Swanson v. Village of Lake in the Hills*, 962 F.2d 602, 603–04 (7th Cir.1992). "A genuine issue of material fact exists only when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *County of Vernon v. United States*, 933 F.2d 532, 534 (7th Cir. 1991). Rule 56(c) requires entry of summary judgment if the nonmoving party fails to come forth with evidence to refute the allegations of the moving party in the motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### B.

■ The parties do not dispute that the CFS Continental Severance Pay Plan is an

---

1. The parties presented arguments to the district court concerning exhaustion of remedies and the futility doctrine as those doctrines related to standing. Because we have determined plaintiffs are not "participants" in the Plan, we need not address whether plaintiffs Jung, Wall and Vitucci have standing to challenge Staley's denial of benefits.

employee welfare benefit plan governed by ERISA. 29 U.S.C. § 1001 *et seq.* The United States Supreme Court has declared that when an ERISA claim involves a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), the eligibility determination is to be "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 112, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Because the CFS Plan does not expressly give the administrator discretion to construe the terms of the Plan or make determinations as to eligibility, the district court appropriately construed the terms of the Plan under a *de novo* standard of review. *Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d 302, 307 (7th Cir.1992). In *Firestone,* the Supreme Court also stated that

> "[t]he terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.' Restatement (Second) of Trusts § 4, Comment d (1959).
>
> "The trust law *de novo* standard of review is consistent with judicial interpretation of employee benefit plans prior to the enactment of ERISA."

*Firestone,* 489 U.S. at 112, 109 S.Ct. at 955. Thus, the trial court must attempt to discern the intent of the creator of the welfare plan. The Supreme Court has expressly authorized the federal courts to "develop a federal common law of rights and obligations under ERISA-regulated plans," *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987), and explained that the purpose of the federal common law is "to protect contractually defined benefits." *Massachusetts' Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). Pursuant to the Supreme Court mandate to develop federal common law, this court has stated "that any ambiguities in ERISA plans and insurance policies should be resolved by referring to the federal common law rules of contract interpretation." *Hammond v. Fidelity and Guaranty Life Ins. Co.,* 965 F.2d 428, 430 (7th Cir.1992).

 The plaintiff's claim for severance benefits is a matter of contract interpretation. When there are no triable issues of fact, we have held that "[c]ontract interpretation is a subject particularly suited to disposition by summary judgment." *Metalex Corp. v. Uniden Corp. of America,* 863 F.2d 1331, 1333 (7th Cir.1988). When interpreting written contracts, the trial judge initially makes the determination of whether the contract is ambiguous or unambiguous as a matter of law. *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3rd Cir. 1991). "[S]ummary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact." *Ryan,* 877 F.2d at 602. Only after a court has ruled that a contract is ambiguous may it consider extrinsic evidence to resolve an ambiguity. *See id.; see also Senn v. United Dominion Industries, Inc.,* 951 F.2d 806, 814–15 (7th Cir.1992) (interpretation of contract terms "should be determined without reference to extrinsic evidence if the terms of the writings involved are unambiguous"); *Bellino v. Schlumberger Tech., Inc.,* 944 F.2d 26, 32 (1st Cir.1991) ("[b]asic contract and trust principles preclude federal courts from considering extrinsic evidence where the ERISA terms in question are unambiguous"). Thus when one party files a motion for summary judgment requiring interpretation of a contract, the district court must determine (1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any triable issues of fact. In the instant case, the trial court made a determination that the contract was ambiguous, and thereafter considered the extrinsic evidence. After review, the court found no triable issue of fact because the undisputed extrinsic evidence presented in the form of defense affi-

davits conclusively established the intent of the plan.

## C.

 In this appeal, we must initially determine whether the phrase "any employee who . . . is employed by and located at the headquarters office of CFS" is ambiguous, and if so, whether extrinsic evidence clarifies the ambiguity. The district court found that "although the term 'headquarters' is not ambiguous on its face, its intended meaning is uncertain." Mem.Op. at 5.[2] Our review of the district court record reflects that after CFS was acquired by Staley it was re-organized and divided into three distinct divisions ((1) headquarters, (2) manufacturing and (3) distribution). At this time, CFS drafted the severance plan for CFS headquarters employees to protect them in the event of a future change in corporate control. Subsequent to adopting the Plan, the headquarters and manufacturing division were moved to the same location in Rolling Meadows, Illinois with the headquarters offices on the tenth through twelfth floors of One Continental Towers and the manufacturing division located on the sixth floor of the building. Based on the language of the Plan, we are of the opinion that the term "headquarters" is ambiguous because it could refer to corporate headquarters (the logical interpretation), but a broader reading, albeit less plausible, might also include manufacturing headquarters and distribution headquarters. Because the Plan language is ambiguous, we must look to the extrinsic evidence to determine whether the meaning of the term "headquarters" remains ambiguous, i.e., is the term "subject to reasonable alternative interpretations?" *Taylor*, 933 F.2d at 1232.

We are of the opinion that the term "headquarters" was intended to include only those employees located at 100 South Wacker Drive, Chicago, Illinois, who performed corporate headquarters functions. First, the common and plain meaning of the term headquarters is "a chief or usual place of business: the administrative center of an enterprise or activity." Webster's Third New International Dictionary (1981). The record

reveals that the corporate headquarters, located on 100 South Wacker Drive and relocated to the tenth through twelfth floors of One Continental Towers, is the sole unit of CFS that satisfies the definition of headquarters. Only the headquarters office could be called the "chief or usual place of business" because the office was the administrative center for the CFS enterprise. Michael Hickey, one of the plaintiffs, acknowledged that the headquarters office located at 100 South Wacker Drive had "jurisdiction" over the "whole company." The headquarters office performed the usual corporate functions for CFS including but not limited to accounting, taxes, insurance, and human resources. The manufacturing and distribution staff merely performed those functions indigenous to their respective divisions. Second, the record establishes that not a single manufacturing or distribution division employee has ever received benefits under the Plan. As evidence of the fact that manufacturing and distribution employees were not intended to be covered by the Plan, Staley negotiated individual separation agreements with three distribution division employees. Those three employees sought to protect themselves because they were aware of the fact that they were not covered by the Plan. Third, Staley never notified the plaintiffs that the Plan covered them nor are there any written company documents such as a handbook or memoranda signifying that the Company ever intended to cover them (the plaintiffs) under the Plan. It is reasonable to assume that Staley and its counsel were aware of the sizable penalties ($100 a day) under ERISA's disclosure provisions, 29 U.S.C. § 1132(c), thus Staley's failure to advise the plaintiffs of the Plan lends further credence to the belief that Staley did not intend the Plan to cover them. Finally, and most conclusively, Robert Pirsein, CFS's Vice President of Human Relations, was able to explain to the satisfaction of the trial court the rationale for limiting the participant class. He stated that "in the event of a corporate takeover of CFS, the CFS headquarters' office positions would be less secure than the CFS divisional [manufacturing and distribution] staff positions."

---

**2.** On appeal, the parties concede that the meaning of the term "headquarters" is ambiguous.

Affidavit at ¶ 5. Because Pirsein believed headquarters employees would be more vulnerable after a takeover, CFS, in the exercise of its business judgment, recognized the need to offer those employees a severance plan.

The record supports Pirsein's explanation of the Plan intent. First, CFS corporate headquarters employees were geographically separate and distinct from manufacturing and distribution division employees. Manufacturing and headquarters were formerly located in separate buildings, and even after they moved to the same building (One Continental Towers) they continued to operate as separate divisions located on different floors. Secondly, headquarters employees performed administrative functions for the entire CFS corporation including the manufacturing and distribution divisions, as contrasted with manufacturing and distribution employees whose work related only to their respective units. The testimony of Plaintiff Hickey further corroborates the Pirsein Affidavit, Hickey stated,

> "[W]e knew that the 100 South Wacker Drive was going to close and there was only going to be one corporate office. It's really at that time it's my understanding that when the initial severance pay plan was put together was because of that. They knew it was going to close and certain people would wind up leaving and certain would not."

Appellee's Brief at 12 (quoting Hickey Deposition at 21). We have been unable to discover anything in the Plan or in the extrinsic evidence to refute the defendant's intention to protect only those employees who worked at 100 South Wacker at the time of drafting the plan.

 In defending against the motion for summary judgment, the plaintiffs failed to offer any evidence to contradict the affidavits of Pirsein and Busch, much less any evidence to support their theory and/or demonstrate that they were entitled to severance benefits. As we have previously explained, a nonmoving party may not rest on its pleadings but must come forth with specific evidence capable of refuting the moving party's evidence. *See supra* at 6 (quoting *Swanson*, 962 F.2d at 603–04). Our *de novo* review of the record fails to reveal any facts that contradict the evidence presented in the defendant's affidavits.[3] Initially, we examine the plaintiffs' filings in opposition to defendant's motion for summary judgment. The plaintiffs argue that the mere fact of ambiguity is sufficient to establish a genuine issue of triable fact. This assertion is not the law; the plaintiffs must refute the defendant's affidavits with something more than unsupported allegations of hearsay and emphatic recitation of their original pleading. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Secondly, the plaintiffs contend that the defendant is reading a "secret requirement" into the Plan. They argue that section 2.1 of the Plan does not limit the participant class to "*corporate* headquarters' employees", to "100 South Wacker employees," or to "an April 1987 eligibility date." Thus the plaintiffs allege that the defendant's interpretation of the Plan creates "secret terms" which the court should refuse to enforce. This allegation merely restates the plaintiffs' complaint. The defendant, on the other hand, has offered specific evidence in affidavits and pleadings to explain an otherwise ambiguous term. The defendant's evidence includes facts regarding the CFS corporate structure which was composed of employees in three separate and distinct units who had responsibilities unique to their respective unit. The defendant also presented evidence concern-

---

**3.** To establish a contrary intent, plaintiff has offered on appeal the enabling resolutions of the compensation committee and the board of directors, approving the Plan. "[T]his court has repeatedly stated that arguments raised for the first time on appeal are waived." *United States v. Harty*, 930 F.2d 1257, 1261 (7th Cir.) (quoting *Colon v. Schneider*, 899 F.2d 660, 670 (7th Cir. 1990), *cert. denied, Gurgone v. United States,* —— U.S. ——, 112 S.Ct. 262, 116 L.Ed.2d 215 (1991)). Because appellants did not introduce this evidence at the trial court, they have waived their right to do so on appeal, "a party opposing a summary judgment motion must inform the *trial court* of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so and loses the motion, it cannot raise such issues on appeal." *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 603–04 (7th Cir.1989) (emphasis added) (quoting *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 946 (7th Cir.1988)).

ing the separation agreements that a CFS corporate executive negotiated with three non-headquarters employees because those employees were not covered by the Plan. Furthermore, Staley presented affidavits establishing that not a single manufacturing or distribution employee had ever received severance benefits. Finally, they offered the Pirsein and Busch affidavits which conclusively establish the intent of the CFS Severance Plan to cover only the employees of the 100 South Wacker corporate office. The defendant has unmistakably met its burden and come forward with clear extrinsic evidence of the *intent* of the Plan. We see no merit to the plaintiffs' assertion that eligibility limited to corporate headquarters employees creates a secret condition or constitutes an arbitrary and capricious construction of the Plan. The language of the Plan, considered along with the undisputed extrinsic evidence, results in only one possible interpretation of the term "participant." Rather than covering the manufacturing and distribution division employees, the Plan was intended to cover only those workers who performed corporate office functions and were employed at the 100 South Wacker Drive headquarters. In light of this determination, we agree with the finding of the district court that the plaintiffs failed to demonstrate the existence of any triable issues of fact. Our interpretation of the CFS severance policy does not add terms to the Plan much less enforce any "secret conditions." Rather, this court has merely determined from unrefuted evidence that the defendant intended to protect a certain class of employees. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985).

The plaintiffs cite *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1354–56 (9th Cir.), *cert. denied,* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), for the proposition that this court should refuse enforcement of such an unreasonable interpretation by the plan administrator. *Blau* is clearly distinguishable from the case at bar. In *Blau,* the court

found "bad faith" on the employer's part in concealing the severance policy, having no claims procedure, and treating similarly situated employees inequitably. *Id.* 748 F.2d at 1350–56. Subsequent courts, including this one, have distinguished the extreme misconduct in *Blau* in refusing to award employees benefits. *See Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 744–45 (7th Cir.1992) (finding no evidence of bad faith or concealment of the severance policy); *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 920–21 (3rd Cir.1990) (refusing to award employees benefits because no active concealment or unfair treatment of claims occurred), *cert. denied,* —— U.S. ——, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). The instant case is similar to *Kreutzer* and *Berger* because the plaintiffs have not alleged any ERISA violations. Rather, they claim that the defendant's reading of the term "participant" is unreasonably narrow because it excludes any employee who was not employed at 100 South Wacker Drive before April 7, 1987. Such a claim falls far short of the bad faith violations in *Blau.* Moreover, the plaintiffs have failed to offer any evidence of a contrary Plan intent. Based upon our review of the record and the applicable case law, we hold as a matter of law that "headquarters" referred only to those people who performed corporate office functions for all the divisions of CFS and were employed at the CFS corporate headquarters on 100 South Wacker Road, Chicago, Illinois prior to the move to Rolling Meadows.[4]

### D.

Finally, the plaintiffs assert that even if the Plan intended to cover only corporate headquarters personnel, the district court erred in declaring April 1987 as a cutoff date for participants. While we agree with plaintiffs that neither the court nor the Plan administrator may create terms not intended by the Plan, plaintiffs' contention fails for two reasons. First, the defendant's affidavits reveal that the Plan was intended to

---

4. Our holding is also supported by the reasoning of the court in *Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449 (7th Cir.) (applying Illinois rules of contract interpretation), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991).

*Lumpkin* held that "[i]f the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." *Id.* 933 F.2d at 456.

cover corporate headquarters personnel at the 100 South Wacker facility. The affidavits declare that the "participant" class was limited to CFS corporate headquarters employees only because they were "less secure" in the event of a corporate takeover. The plaintiffs were never employed at 100 South Wacker and thus were never considered as corporate headquarters employees. Moreover, their relocation to Rolling Meadows did not transform them into corporate headquarters employees. The record reveals that all the plaintiffs continued to perform manufacturing functions in a separate division in a different area from the corporate headquarters employees.

Secondly, ERISA governs this Plan only to the limited extent that it governs any welfare plan. This permits plan administrators great latitude in declaring the eligible participants and scope of the Plan. *See, e.g., Fletcher v. Kroger Co.,* 942 F.2d 1137, 1139 (7th Cir. 1991). Creation of severance plans is optional with the employer, ERISA merely dictates the procedures regulating the plan. *See Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1047 (7th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). In *Fletcher,* we noted

> In *Firestone,* the court held that the denial of benefits by the administrator of a benefits plan should be reviewed *de novo* unless the plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Yet *Firestone* "does not bring design decisions within ERISA." Rather *Firestone* is limited to questions of plan *interpretation* "and does not purport to expand the scope of ERISA to include design decisions defining the parameters of a program."

942 F.2d at 1139 (quoting *Belade v. ITT Corp.,* 909 F.2d 736, 738 (2d Cir.1990)). Decisions of this Circuit have recognized that plan providers have great latitude in determining whom to include in a plan and the scope of the plan. "Welfare benefits, moreover, do not vest like pension benefits, and an employer unilaterally may change or abolish them without violating ERISA." *Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 743 (7th Cir.1991). In *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985), the Supreme Court stated that ERISA "does not regulate the substantive content of welfare

benefit plans." Congress never intended ERISA to dictate the *content* of welfare benefit plans, much less for the federal courts to determine the *content* of such plans. The plaintiffs, however, are arguing that Staley *should have* included them as plan participants. We hold that the plaintiffs are without a legal basis on which to ask this court to include them in the Plan because the discretion to make decisions concerning the content of the Plan rests with the Plan administrator, *Fletcher,* 942 F.2d at 1139, and it would contravene Congress' intent for this court to dictate the content of a welfare benefit plan. *See Metropolitan Life Ins. Co.,* 471 U.S. at 732, 105 S.Ct. at 2385. The defendant's affidavits clearly demonstrate that the Plan was not drafted with the intention of including the plaintiffs' class. Accordingly, the ruling of the district court is

AFFIRMED.