**ECHO, INCORPORATED, an Illinois Corporation, Plaintiff–Appellee,**

v.

**The WHITSON COMPANY, INC. d/b/a Power Tool Company, a Tennessee Corporation, Defendant–Appellant.**

**No. 94–2538.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1994.

Decided April 17, 1995.

---

Gary D. Santella, Susan M. Rentschler (argued), Masuda, Funai, Eifert & Mitchell, Chicago, IL, for ECHO, Inc.

Michael T. Reid, Halfpenny, Hahn, Roche & Marchese, Chicago, IL (argued), for Whitson Co., Inc.

Before POSNER, Chief Judge, and BRIGHT[*] and KANNE, Circuit Judges.

KANNE, Circuit Judge.

ECHO, Incorporated (ECHO) is an Illinois corporation engaged in the business of manufacturing and selling portable outdoor equipment, such as leaf blowers, trimmers, and chain saws. The Whitson Company, Inc., d/b/a Power Tool Company ("PTC"), is a Tennessee corporation engaged in the business of distributing, wholesaling, and reselling, among other things, portable outdoor equipment. ECHO and PTC entered into a distributorship agreement which provided that PTC was to promote the sale of ECHO products in Tennessee. Under this agreement, PTC would submit purchase orders to ECHO, and ECHO would sell and deliver to PTC the equipment ordered at the price specified in the purchase orders.

The business relationship between ECHO and PTC eventually broke down. At some point ECHO notified PTC of its intent to terminate the Tennessee distributorship because of PTC's lack of sales performance and PTC's reduction in complimentary product lines, reduction in sales staff, reduction in training, and questionable credit rating. PTC challenged ECHO's termination of the distributorship agreement, but to no avail.

Following ECHO's termination of the agreement, however, PTC still owed ECHO for equipment it had previously purchased. In order to enable PTC to pay off its account, ECHO agreed to repurchase PTC's inventory of ECHO products. ECHO applied an inventory credit of over $123,000 to PTC's account, leaving a balance due ECHO in the principal amount of $93,417.21, which PTC admits that it owes. However, PTC refuses to pay this debt because it argues that it has sustained unliquidated damages from

* The Honorable Myron H. Bright, of the Eighth Circuit, sitting by designation.

ECHO's termination of the distributorship agreement.

ECHO brought suit against PTC in Illinois state court to collect the principal amount of $93,417.21. ECHO also sought to recover service charges (late fees) or, alternatively, prejudgment interest pursuant to the Illinois Interest Act. PTC removed the case to federal court and filed an answer, set-off, and counterclaim. PTC's counterclaim alleges that ECHO breached a separate sales contract, wrongfully terminated the Distributorship Agreement, breached an implied covenant of good faith and fair dealing in terminating the Distributorship Agreement, and breached the repurchase agreement by failing to apply over $2,000 of additional credit. PTC acknowledges that the only reason it has refused to pay the undisputed $93,417.21 it owes ECHO is that it claims it has sustained unliquidated damages in excess of ECHO's claim.

The district court granted ECHO's motion for summary judgment and determined that PTC's counterclaim does not preclude the entry of a final judgment in ECHO's favor because the breaches alleged in PTC's counterclaim do not relate to the same contract or transaction which forms the basis of ECHO's complaint. Pursuant to FED.R.CIV.P. 54(b), the district court directed entry of a final judgment for ECHO in the amount of $93,-417.21 plus prejudgment interest in the amount of $7,089.17, for a total judgment of $100,506.68. PTC appeals the district court's grant of summary judgment. PTC's counterclaim remains pending in the district court.

On appeal, PTC argues that its claims and ECHO's claims arise out of the same contract, or at least that the parties dispute material facts on this issue, thereby precluding summary judgment. And because the claims arise out of the same contract, PTC argues, it should not be required to pay the amount awarded to ECHO through summary judgment until the district court disposes of its counterclaim. Such delay would allow PTC to apply its debt to ECHO against any damages it wins from ECHO.

Regardless of our ruling on the issue before us here, however, PTC must wait until the trial on its counterclaim before knowing whether it can satisfy its debt to ECHO with less than the purchase price of the goods it received. It is worth noting that, even if we uphold the district court's grant of summary judgment, PTC might yet achieve a further delay in paying ECHO by moving for a stay of proceedings to enforce judgment pursuant to FED.R.CIV.P. 62(h) until the counterclaim is resolved. This might effect the set-off PTC seeks because, if PTC wins on its counterclaim, the two judgments will become executory simultaneously. The real point is that only the resolution of the counterclaim will ultimately determine how much money each party owes the other. This case merely represents a dispute over how to begin the accounting process.

### Standard of Review

A discussion of our standard of review of summary judgments in the context of UCC § 2-717 is particularly important in this case. The district court held that "[w]hether there is more than one contract for purposes of § 2-717 is a question of law." The district court relied on *Carlisle Corp. v. Uresco Constr. Materials, Inc.*, 823 F.Supp. 271, 274 (M.D.Pa.1993), which in turn relied on *Hellendall Distributors, Inc. v. S.B. Thomas, Inc.*, 559 F.Supp. 573, 574 (E.D.Pa.1983), *aff'd*, 755 F.2d 920 (3rd Cir.1985), for this standard. *Hellendall* is based on the pronouncement of *Sharp Electronics Corp. v. Arkin–Medo, Inc.*, 86 A.D.2d 817, 452 N.Y.S.2d 589, 590 (1st Dept.1982), *aff'd*, 58 N.Y.2d 986, 461 N.Y.S.2d 1014, 448 N.E.2d 799 (1983), that breach of an unspecified distributorship agreement does not bar summary judgment against a claim for set-off that alleges the unity of the distributorship agreement and the purchase orders executed under its auspices.

Indeed, where no relevant underlying agreement is presented to the court, it may be for the court to decide whether there is more than one contract for purposes of § 2-717. However, that judgment would be based upon the burden of the non-moving party to rely on more than its pleadings to avoid summary judgment. *See* FED. R.CIV.P. 56(e). It is a scenario factually

distinguishable from the case before us, as we have no dispute that both the underlying distributorship agreement and the purchase orders exist.

The statement that courts will determine whether there is more than one contract remains true only up to a point. We have no more power to interpret contracts in the context of § 2–717 than we do in any other context. That is, we do not have absolute power to say whether the parties' claims arise out of the same contract. We must look to the controlling law, the law of Illinois in this case,[1] for the parameters of our power to interpret contracts. Within those parameters we may say whether each party's claims arise out of the same contract.

 With that caveat in mind, we review the district court's grant of summary judgment *de novo*. *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir.1988). Contract interpretation is particularly suited to disposition by summary judgment. *Id.* Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. Under Illinois law, we must first decide whether the contract is ambiguous. *Metalex*, 863 F.2d at 1333. If the contract is unambiguous, there is no issue of material fact and the court must determine the contract's meaning as a matter of law. *Id.* But if the contract is ambiguous, the contract's meaning is a question for the trier of fact. *Id.* A contract is ambiguous, under Illinois law, only if it is *"reasonably* and *fairly* susceptible to more than one meaning." *Id.* (quoting *Lenzi v. Morkin*, 116 Ill.App.3d 1014, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1983)) (emphasis added), *aff'd*, 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984). A disagreement between the parties as to a contract's meaning does not necessarily render the contract ambiguous. *Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 621 (7th Cir.1989), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

### *Whether ECHO's and PTC's Claims Arise from the Same Contract*

 The Illinois version of the UCC, comporting with common sense, provides that a buyer must pay for the goods it accepts. 810 ILCS 5/2–206(1). It also provides that, upon notifying the seller, the buyer "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." 810 ILCS 5/2–717. PTC has accepted goods from ECHO, but has refused to pay under the set-off authority of § 2–717. The question for us is whether the contract that ECHO allegedly breached, the distributorship agreement, and the contract under which PTC owes ECHO, a purchase order pursuant to the distributorship agreement, are the same contract for purposes of § 2–717. *See generally, Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1439 (7th Cir.1993) (discussing the one contract— multiple contracts issue).

As a general matter in applying § 2–717, we have held under Illinois law that distributorship agreements and the purchase orders that arise under them are different contracts. *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064 (7th Cir.1987). Therefore, the price of the goods a buyer accepts pursuant to a purchase order is not susceptible to set-off against damages the buyer sustains as a result of a seller's alleged breach of a related distributorship agreement. *Id.* *Schieffelin* is based on *Rebaque v. Forsythe Racing, Inc.*, 134 Ill.App.3d 778, 89 Ill.Dec. 595, 480 N.E.2d 1338 (1985), which held that a seller is entitled to the price of goods that the buyer has accepted, regardless of the buyer's claim under a remote transaction.

Particularly important to the *Schieffelin* court was that purchase orders, not the distributorship agreement, designated the price, type, and quantity of the goods for any particular sale. *Schieffelin*, 823 F.2d at 1067. These important factors reflect the UCC's commentary that "To bring this provision into application the breach involved must be of the same contract under which the price in question is claimed to have been earned." 810 ILCS 5/2–717, cmt. 1. In other words,

---

1. *See infra.*

whether the claims arise out of the same contract depends on the source of the rights each party claims.

Very recently we reaffirmed our position that in Illinois distributorship agreements and the purchase orders that arise under them are not the same contract for purposes of § 2–717. *Shintom America, Inc. v. Car Telephones, Inc.,* 45 F.3d 1107, 1109 (7th Cir.1995). Thus, PTC faces an uphill battle in persuading us to allow set-off.

Under the UCC, however, the parties may expand or shrink their rights consistent with its various provisions. 810 ILCS 5/1–102(3) & (4). Section 2–717 does not prohibit parties from drafting contracts that expand or shrink their rights to set-off. PTC argues that two clauses of the distributorship agreement effectively expand their rights to set-off under § 2–717 (and *Schieffelin* and *Shintom America*) to include set-off against violations of the distributorship agreement. The two clauses read as follows (ECHO is the Company and PTC is the Distributor):

5.1 *Purchase Orders.* Concurrently with the execution of this agreement, Distributor shall submit to Company its purchase orders for the first shipment of Products. All purchase orders of Distributor shall, unless otherwise agreed by Company from time to time, set forth the quantity of the Products desired, the specification therefor, the desired delivery date, the price of each Product, and all other relevant information necessary to effectuate shipment of the Products by Company. It is contemplated that from time to time purchase orders, in forms prepared by Distributor or other purchasers, may be used in ordering products and that there may be included in such forms certain stipulations, conditions or agreements not otherwise contained herein. **It is expressly understood and agreed that the provisions of this Agreement shall be deemed a part of each purchase order which shall be inconsistent or contrary to the provisions of the Agreement shall be deemed amended or deleted as the case may be [sic].** Specifically, all provisions on the backside of said purchase order shall be deemed deleted or superseded by the provisions of this Agreement. (Emphasis added).

9.4 *Entire Agreement.* This Agreement, together with all attachments hereto and all purchase orders issued hereunder constitutes the entire agreement between the parties and supersedes any and all previous agreements, memoranda, or other understandings of the parties. This agreement may be amended only in writing.

The emphasized language of clause 5.1 is the operative text. The remainder of the paragraph is necessary, however, to set the operative language into its proper context. PTC claims that clause 5.1 combines the distributorship agreement and the purchase orders into one contract when it states that the provisions of the distributorship agreement become part of the purchase orders. And because the distributorship agreement is part of the purchase orders, PTC argues, ECHO's claim under a purchase order and PTC's claim under the distributorship agreement are really claims under the same contract. For example, the termination clause of the distributorship agreement, under which PTC asserts part of its counterclaim, becomes part of each and every purchase order through clause 5.1.

This is a fiction that cannot survive. First, the sentence upon which PTC relies, though jumbled a bit, says unambiguously that the distributorship agreement will become a part of the purchase order where the two conflict and that the purchase order will be amended or deleted accordingly. Second, the remainder of the provision, its all-important context, underscores what the paragraph targets: the possibility that the parties will engage in a battle of inconsistent purchase order forms. The sentence preceding the highlighted language recognizes the possibility that the buyer may in some cases use forms inconsistent with the distributorship agreement. The sentence following the highlighted text identifies the particular language of the purchase orders, that appearing on the backside, that is to be deleted or superseded by the distributorship agreement in the event of inconsistency.

This context demonstrates that clause 5.1 has a very narrow sphere of influence. Only

in instances where the parties use conflicting forms, or where a purchase order conflicts with the distributorship agreement, does paragraph 5.1 apply. And when paragraph 5.1 does apply, it impacts the purchase order only to the extent that it designates what language controls. Paragraph 5.1 unambiguously does not provide PTC with greater rights to set-off because it does not make the distributorship agreement part of *every* purchase order.

The second clause also fails to expand PTC's rights under § 2–717. Paragraph 9.4 is a boilerplate merger or integration clause. The purpose of such a clause is to prevent either party from introducing parol evidence to prove that an agreement other than the distributorship agreement and its supplements existed. The merger clause encompasses the purchase orders because they, as supplements to the distributorship agreement, contain details that would inform a trier of fact as to the content of the deal. The clause states that the distributorship agreement, its attachments, and the purchase orders constitute the entire agreement. However, this does not mean that they are one contract. It merely means that the enumerated articles compose all of the dealings between the parties that may be used to prove the content of those dealings. We do not believe that the language of Paragraph 9.4 is reasonably or fairly susceptible to the interpretation that it unifies the purchase orders with the distributorship agreement.

■ PTC also argues that ECHO is trying to have it both ways with the distributorship agreement. ECHO invoked the jurisdiction of the Illinois courts by citing a provision in the distributorship agreement that established both parties' consent to jurisdiction in Illinois "with respect to any legal proceedings arising out of this Agreement." The distributorship agreement also established that Illinois law would control any such litigation. ECHO attached a copy of the distributorship agreement to its complaint. From these facts, PTC argues that ECHO has admitted that the purchase orders arise out of the distributorship agreement. ECHO responds by saying that its reference to the distributorship agreement only provid-

ed the court with background regarding the transactions between the parties.

PTC's claim in this regard raises an interesting issue: whether there is any difference in scope between § 2–717's limitation of set off to the "same contract" and the distributorship agreement's consent to jurisdiction and choice of law for matters "arising out of this agreement." No matter how interesting, however, we will not reach that question because jurisdiction and choice of law for the purchase orders at issue do not hinge on ECHO's invocation of the distributorship agreement.

The district court had diversity subject matter jurisdiction because the parties are from different states and the amount in controversy exceeds $50,000. 28 U.S.C. § 1332. The parties consented to personal jurisdiction simply by participating in the proceedings before the district court without protest. *See Continental Bank, N.A. v. Meyer,* 10 F.3d 1293, 1296 (7th Cir.1993) (noting that the issue of personal jurisdiction is waived where the parties fully participate in litigation on the merits); FED.R.CIV.P. 12(h)(1). We have appellate jurisdiction under FED. R.CIV.P. 54(b) and 28 U.S.C. § 1291.

■ With federal jurisdiction established in a district court within the state of Illinois, we look to Illinois choice of law rules to decide which state's laws to follow. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). We review choice of law *de novo. Forum Corp. of America v. Forum Ltd.,* 903 F.2d 434, 438 (7th Cir.1990). Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law. *Checkers, Simon & Rosner v. Lurie Corp.,* 864 F.2d 1338, 1345 (7th Cir.1988) (citation omitted). Neither party has argued that any state's substantive law other than Illinois' should apply, so choice of law defaulted to Illinois along with jurisdiction regardless of what the distributorship agreement states. Because jurisdiction and choice of law are settled, ECHO's invocation of the distributorship agreement to establish both for the purchase orders is surplusage.

The purchase orders created ECHO's rights to the purchase price of the goods that PTC accepted, and the distributorship agreement bestowed PTC with the rights upon which it counterclaims. Each party's rights have their origins in different contracts, and we have determined that such a state of affairs precludes set-off. *Schieffelin,* 823 F.2d at 1067; *Shintom,* 45 F.3d at 1109. Therefore, summary judgment and its entry pursuant to Rule 54(b) are appropriate in this instance. If parties want to contract around the presumption against the unity of distributorship agreements and purchase orders for purposes of § 2–717, they may do so by explicit provision. Neither a battle-of-the-forms clause nor a boilerplate merger or integration clause will suffice for this purpose.

AFFIRMED.